REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 393

September Term, 2014

_____

MARYLAND STATE BOARD OF NURSING

v.

MABINTY SESAY

_____

Krauser, C.J.,
Eyler, Deborah S.,
Leahy,

JJ.

_____

Opinion by Leahy, J.

_____

Filed:  August 27, 2015

In this appeal, we address the obligations of the Maryland State Board of Nursing ("the Board") to provide a practical nurse with notice of an evidentiary hearing concerning her violations of the Nurse Practice Act. In 2010, Mabinty Sesay, a licensed practical nurse, was alleged to have committed several violations of the Nurse Practice Act, and the Board, in 2011, issued charges against Ms. Sesay. The Board mailed notice of the charges and instructions on how to request an evidentiary hearing to Ms. Sesay. Ms. Sesay received notice of the charges, requested an evidentiary hearing and provided an address to which she directed the Board to send further correspondence. In 2013, the Board mailed Ms. Sesay notice of the evidentiary hearing to the address she provided, via certified and first-class mail. Ms. Sesay did not receive the notices because she had not provided the Board with her current address, as she was required to do by statute, and the notices were returned to the Board. The Board held a hearing regarding Ms. Sesay's license, without Ms. Sesay's presence, concluded that Ms. Sesay had violated the Nurse Practice Act, and ordered discipline for Ms. Sesay, including probation. Ms. Sesay filed a notice for petition of review of the Board's decision in the Circuit Court for Montgomery County. After a hearing, the court concluded that that the Board did not comply with due process requirements and was required to take further reasonable steps upon the return of both mailings. The court vacated the Board's decision and order.

In its timely appeal,[1] Appellant Maryland State Board of Nursing ("the Board")

---

[1] The circuit court's order, dated April 16, 2014, was entered on April 17, 2014, and the Board filed its appeal within thirty days on May 7, 2014. *See* Maryland Rule 8-201(a).

raises two questions for our review:

I. Did the Board provide Ms. Sesay with legally sufficient notice of an evidentiary hearing concerning her violations of the Nurse Practice Act, when the Board sent notice to the last address that Ms. Sesay had provided the Board, and after Ms. Sesay failed to comply with a duty imposed on her by Maryland law to inform the Board of any change of address?

II. Did substantial record evidence support the Board's findings that, by falling asleep while caring for a quadriplegic child and later falsifying that child's medical record to bill for time in which she was not working, Ms. Sesay violated the Maryland Nurse Practice Act?

We hold that the Board provided Ms. Sesay with legally sufficient notice of an evidentiary hearing and further hold that substantial evidence supported the Board's findings that Ms. Sesay violated the Maryland Nurse Practice Act. Our holding recognizes the State's responsibility to protect the public health and instructs professionals licensed by the State that they may not, especially in the midst of administrative proceedings in which charges have been brought against them, fail to update their address with the appropriate regulatory body and thereby avoid accountability.[2] Therefore, we reverse the judgment of the Circuit Court for Montgomery County.

---

[2] A licensed practical nurse is recognized as a member of the health professional team and performs an integral part of nursing. Md. Code (1981, 2014 Repl. Vol.), Health Occ. Art. ("H.O.") § 8-311(b). Licensed practical nurses are governed by the standards of professional performance articulated in Code of Maryland Regulations ("COMAR") 10.27.10.03.

**BACKGROUND**

A. <u>Ms. Sesay's Provision of Nursing Care in November, 2010</u>

In November 2010, Mabinty Sesay was a practical nurse licensed by the State of Maryland and employed by Maxim Health Care Services ("Maxim"). On the dates of November 27-28, Ms. Sesay was assigned to provide in-home, overnight nursing care to E.C., a young man with quadriplegia who has no movement, aside from weak use of his biceps and triceps, from the chest down. He also has autonomic dysreflexia, which can cause a dangerous, rapid increase in blood pressure when he has a full bladder.

E.C.'s mother ("Ms. C.") had several grievances regarding Ms. Sesay's performance. According to Ms. C., on the night of November 27, Ms. Sesay failed to wash her hands until asked, had difficulty performing tasks, and was observed sleeping at 4:00 a.m. On the night of November 28, at around 11:00 p.m., E.C. had been calling out for Ms. Sesay because he needed to urinate, but Ms. Sesay had fallen asleep and did not respond. At around 2:00 a.m., E.C. began calling out again for Ms. Sesay for about 15 minutes, but Ms. Sesay did not respond because she had fallen asleep in a bed she made for herself on the living room floor. Upon waking Ms. Sesay at around 2:15 a.m., Ms. C. dismissed her for sleeping. Ms. C. noticed, however, that Ms. Sesay had documented on her flow chart that she provided nursing care for E.C. at 5 a.m. and left at 6:30 a.m. She also noticed that Ms. Sesay had signed Ms. C's name on the document. Ms. Sesay, on the other hand, maintained that she had not been sleeping while working and that she was permitted to stay until her shift was over at 6 a.m.

Ms. C. thereafter called Maxim about the events at the C. residence, and, Maxim, after unsuccessfully trying to meet with Ms. Sesay about the situation, terminated Ms. Sesay's employment on November 30, 2010. The following week, on December 6, 2010, Ms. C. filed a complaint against Ms. Sesay with the Board. Attached to her complaint was a photograph that she claimed she took of Ms. Sesay sleeping on their living room floor. Also attached to the complaint were signed, hand-written statements from E.C., E.C.'s father, and E.C.'s brother detailing Ms. Sesay's poor performance.

B. The Board Files Charges Against Ms. Sesay and Provides Notice of the Evidentiary Hearing

After conducting an investigation into the complaint, the Board issued formal charges against Ms. Sesay on September 21, 2011. The document alleged that she "[w]illfully and knowingly (i) [f]ile[d] a false report or record of an individual under the licensee's care"; that she acted "inconsistent[ly] with generally accepted professional standards in the practice of registered nursing or licensed practical nursing"; that she "[s]ubmit[ed] a false statement to collect a fee"; and that she "[e]ngage[d] in conduct that violates the professional code of ethics" set forth in COMAR 10.27.19.02, requiring a nurse to "[a]ssume responsibility and accountability for individual nursing judgments and actions;" and "[not p]ractice nursing if unfit to perform procedures or make decisions because of physical or mental impairment[.]"

That same day, the Board sent a "NOTICE OF AGENCY ACTION-Charges under the Maryland Nurse Practice Act" via first-class and certified mail[3] to two known addresses for Ms. Sesay:  (1) 7333 New Hampshire Ave. #3, Takoma Park, MD 20912; and (2) 601 #3 Silver Spring Ave., Silver Spring, MD 20910.  The letter explained how to request an evidentiary hearing before the Board took any disciplinary action against her license and provided that "[i]f you request a hearing, the Board will notify you in writing, at your address last known to the Board, of the date, time and location of the hearing."

Ms. Sesay timely requested an evidentiary hearing before the Board on September 26, 2011.  She listed her then-current mailing address as:

---

[3] The public frequently uses the terms "first-class mail" and "regular mail" interchangeably, and the two are, in fact, the same thing.  In an attempt to stave off confusion, we will use the term "first-class mail" in this opinion, unless we are quoting a source that uses the term "regular mail," because first-class mail is the term the United States Postal Service ("USPS") uses.  Note, however, that the Maryland Administrative Procedure Act, which this opinion discusses, refers to first-class mail as "regular mail." *See, e.g.*, Md. Code (1984, 2014 Repl. Vol.), State Gov't Art. § 10-209(a).

For first-class mail, the United States Postal Service aims for a delivery time of one to three days.  United States Postal Service, Domestic Mail Manual § 133, 2.0 (July 13, 2015) ("Domestic Mail Manual").  First-class mail will be forwarded to a new address for a period of 12 months if the addressee provides a forwarding address, and it will also be returned to the mailer if such a piece of mail is undeliverable. *Id.* § 133, 2.2.2.

Certified mail, meanwhile, is an extra service that a mail sender may, by paying extra, add to first-class mail. Domestic Mail Manual § 133, 2.2.3.  It is a service that "provides the sender with a mailing receipt and, upon request, electronic verification that an article was delivered or that a delivery attempt was made. . . . Certified Mail is dispatched and handled in transit as ordinary mail." *Id.* § 503, 3.1.1.  For certified mail, USPS includes a record of delivery that includes the signature of the recipient. *Id.*

Thus, one may think of first-class mail as the default form of mail when one ventures to the post office seeking to mail a letter, whereas certified mail is an additional service that one can purchase that contains a record of delivery and requires the signature of the person to whom the item was delivered.

5

11407 July Dr. Apt 203
Silver Spring MD 20904

("the July Drive address"). She also provided two phone numbers. It appears from the record that a settlement conference was held on January 10, 2012, but Ms. Sesay and the Board could not reach a resolution.[4]

On September 1, 2012, Ms. Sesay moved from her July Drive address to 2005 Treetop Lane #41, Silver Spring, MD 20904 (hereinafter "the Treetop Lane address"). Ms. Sesay did not advise the Board of her change of address. Ms. Sesay was required by law to notify the Board of her move within 60 days of her change of address. H.O. § 8-312(e).

On May 17, 2013, the Board mailed a "NOTICE OF HEARING: In the Matter of Mabinty Sesay" to Ms. Sesay at her July Drive address, the last-known address on record, via first-class and certified mail, with the return receipt requested. The notice advised Ms. Sesay that the hearing would be held on Tuesday, July 23, 2013, at 10:00 a.m. at the offices of the Board, 4140 Patterson Avenue in Baltimore, Maryland, 21215. Both notices were returned as undeliverable.

---

[4] The record is equivocal on whether a settlement conference was actually held. During argument before the circuit court, however, counsel for the Board did not "dispute that [Ms. Sesay] probably came into the board at some time or another" and that a gap between a request for a hearing and the hearing itself is "usually indicative of some sort of rumblings of a settlement[,]" but he could not say with certainty that Ms. Sesay came in for a settlement conference. The State's Response to Respondent's Motion to Reconsider, however, quotes a January 11, 2012 memorandum written by the Coordinator for Discipline and Rehabilitation stating that "Ms. Sesay was seen by the Settlement Committee on January 10, 2012. A resolution in her case could not be reached. The case is being returned to you in order to proceed with an evidentiary hearing."

C.  The Board's Evidentiary Hearing and Decision, and Ms. Sesay's Appeal

On July 23, 2013, the Board held a hearing regarding Ms. Sesay's license, and Ms. Sesay was not present.  The Department of Health and Mental Hygiene[5] ("the State"), representing the State, called Ms. C. to testify (via telephone)[6] about E.C. and the incidents that occurred on the nights of November 27-28, 2010.  Ms. C. testified that, on November 27, she found Ms. Sesay sleeping and told her that she could not sleep on the job.  Ms. C. also recalled that Ms. Sesay slept through E.C.'s yelling at 11:00 p.m., her husband was required to awaken Ms. Sesay, and that E.C.'s yelling awakened her husband and other son again at 2:00 a.m., whereupon they found Ms. Sesay sleeping once again.  At this point, Ms. C.'s testimony reflects that she dismissed Ms. Sesay.  Ms. C. also testified that the flow sheet Ms. Sesay submitted showing that she stayed at the C. residence and continued to perform tasks until 6:30 a.m. was false.  Ms. C.'s complaint, hand-written statements,[7] and pictures were submitted as evidence.

The State also called Stephanie Nogle, the Board employee who conducted the investigation into Ms. Sesay.  Ms. Nogle testified about the interview she conducted of Ms. Sesay and the complaint that Ms. C. submitted to the Board, as well as Ms. Sesay's conditions of employment with her former nursing employer, Maxim.  The Board also

---

[5] An assistant attorney general from the Department of Health and Mental Hygiene appeared for the State in the proceeding before the Board.

[6] Ms. C., a nurse, testified via telephone because she was caring for her son at the time.

[7] The statements from Ms. C.'s husband and sons were also submitted into evidence.

admitted into evidence the disciplinary action report from Maxim that Ms. Nogle had obtained in her investigation of Ms. Sesay. In addition to the conduct discussed *supra*, this report detailed that, after Maxim contacted Ms. Sesay, she refused to return to the Maxim office to discuss her conduct because she claimed the office was too far away. When the Maxim employee informed Ms. Sesay that she would not be able to work in any capacity for Maxim until she discussed the incident with Maxim, she stated that she had been working for another Maxim client; Maxim, however, had no record of her working for this client. Upon being told again, in the same conversation, that she would not be able to work for Maxim again until she addressed the disciplinary issue, the disciplinary document relates that she stated that she actually began working for another agency and asked "'Well, what if I don't come in?'" After being informed, once again, that she could not work for Maxim until her disciplinary issues were resolved, Ms. Sesay said that she would not go to the office that week and would call when she was available.

Several months *after* the hearing before the Board, on September 26, 2013, Ms. Sesay renewed her nursing license and provided her Treetop Lane address.

On October 9, 2013, the Board issued a "Final Decision and Order of Probation of Practical Nursing License," which was mailed to Ms. Sesay at her Treetop Lane address. The Board found that Ms. Sesay "slept while on-duty on the evenings of November 27 and November 28, 2010" and concluded that this conduct violated H.O. § 8-316(a)(8), which prohibits nurses from acting inconsistently with professional standards of practical nursing. The Board also found that "despite having been dismissed by [Ms. C.] at approximately 2:00 a.m. on November 28, 2010 after getting caught sleeping on-duty for

8

the second night in a row, [Ms. Sesay] indicated on her flow sheets that she provided nursing care until 6:30 a.m." Based on this conduct, the Board concluded that she violated H.O. § 8-316(a)(5)(i) by filing a false report of client care as well as H.O. § 8-316(a)(11) by submitting a false statement to collect fees.[8] Based on these factual findings and conclusions of law, the Board ordered that Ms. Sesay's license be placed on probation for a minimum of three years subject to a litany of restrictions and conditions, including that her license be publicly listed as being on probation, that she obtain the Board's approval before accepting any nursing position, that she can work only if a registered nurse is physically present, and that she cannot work between the hours of 11:00 p.m. to 7:00 a.m.

On or about October 30, 2013, Ms. Sesay, with notice of the Board's decision, filed a document that the Board treated as a motion for reconsideration.[9] In an attached affidavit, Ms. Sesay asserted that she heard nothing from the Board in the two years since she requested an evidentiary hearing and that she changed addresses on September 1, 2012. Ms. Sesay claimed that she did not have knowledge of the notice that was sent to her former July Drive address and requested another hearing "because she did not receive a notice to appear." On November 6, 2013, Ms. Sesay filed a notice of petition for

---

[8] The Board also provided that "[i]n its discretion, the Board declines to find that [Ms. Sesay] violated H.O. § 8-316(a)(25)," which prohibits conduct that violates the professional code of ethics, and ordered that this charge be dismissed.

[9] The document was labeled "Affidavit of Mabinty Sesay," but was signed by Ms. Sesay's attorney and requested the Board to "grant Respondent's Motion to reconsider." Ms. Sesay's affidavit, signed by her, was attached. The "motion" was almost identical to Ms. Sesay's affidavit.

review of the Board's October 9, 2013 decision.[10]  On November 25, 2013, the Board filed the required agency certificate of compliance pursuant to Maryland Rule 7-202(e).

The Board denied her motion for reconsideration on November 22, 2013, relying on Ms. Sesay's failure to satisfy her statutory obligation to notify the Board of her change of address.  The Board emphasized that "[t]he rationale behind this provision is simple: the Board, as a licensing authority, has important information that it may need to share with its licensees periodically, such as changes in licensure status or, as in this case, notices of administrative hearings."

The Circuit Court for Montgomery County held a hearing on April 4, 2014.  Ms. Sesay argued that the Board was required to do more when the letters were returned as undelivered.  The Board, on the other hand, contended that it did more than what was required by law when it sent first-class mail in addition to certified mail, and, therefore, these efforts to give Ms. Sesay notice complied with due process.

After hearing argument, the court concluded that, although the Board complied with its statutory duty to send the hearing notice via certified mail, it was required to take reasonable steps upon the return of both mailings.  The court agreed with the Board that it did not have "to go to the ends of the earth" to locate Ms. Sesay, but determined that it would not take a "Herculean effort on the part of the board when [the Board] get[s] a letter back saying 'unclaimed' or 'unserved' or 'addressee moved' to pick up the phone

---

[10]  With her Memorandum in Support of Her Appeal of the Decision of the Maryland Board of Nursing, Ms. Sesay attached a UPS Product and Tracking document that purports to show that the certified mail was returned to the Board.

and call" based on the facts presented. The court also found that Ms. Sesay did not intentionally or negligently fail to notify the Board of her changed address, but instead gave every indication that she wanted to be present at the hearing. In addition, the court rejected the Board's argument that the Supreme Court case upon which Ms. Sesay relied, *Jones v. Flowers*, discussed *infra*—which stands for the principle that the State must take reasonable additional steps to provide notice when it has knowledge that its mailings failed—was distinguishable on the ground that it involved a tax foreclosure. The court concluded that losing a job license or having a future "black mark" on the ability to pursue your profession is almost as important as losing your home.

Accordingly, in an order entered on April 17, 2014, the circuit court found that "the Maryland Board of Nursing did not satisfy the due process requirements of notice and opportunity for a fair hearing." The court vacated the Board's Final Decision and Order of Probation of Practical Nursing License and remanded the case back to the Board to schedule a new hearing on the matter. This appeal ensued.

## DISCUSSION

I. Legally Sufficient Notice

The Board contends that it provided constitutionally sufficient notice to Ms. Sesay by complying with the notice requirements set forth in the Nurse Practice Act and the Maryland Administrative Procedure Act ("APA") when it mailed Ms. Sesay notice of her evidentiary hearing to her last known address via both certified and first-class mail. Ms. Sesay counters that the Board violated her right to due process because the Board knew

11

that she did not receive the notices due to their return as undeliverable and failed to take other reasonable measures, like calling her on the phone, to provide notice.

Whether notice is sufficient is a question of law, *Bray v. Aberdeen Police Dep't*, 190 Md. App. 414, 437 (2010), and "'we owe no deference to agency conclusions based upon errors of law.'" *Coleman v. Anne Arundel Cnty. Police Dep't*, 369 Md. 108, 121-22 (2002) (quoting *State Ethics v. Antonetti,* 365 Md. 428, 447 (2001)).

As a threshold matter, we think it important to note, that "the State has a significant interest in protecting its citizens and the public health." *Dr. K. v. State Bd. of Physician Quality Assur.*, 98 Md. App. 103, 120 (1993) *cert. denied*, 334 Md. 18, *cert. denied*, 513 U.S. 817 (1994). The State has an immense public interest in this domain of regulating the medical professions, for the purpose of keeping the public safe. On the other hand, the Board does not, and could not, dispute that Ms. Sesay's nursing license is a constitutionally protected property interest requiring due process of law before the Board can revoke or suspend the license, place the license on probation, or issue any other sanction. *See*, *e.g.*, *Comm'n on Med. Discipline v. Stillman*, 291 Md. 390, 405 (1981) ("The right to practice medicine is a property right of which a physician cannot be deprived without due process of law." (citing *Aitchison v. State*, 204 Md. 538, *cert. denied*, 348 U.S. 880 (1954)); *see also Maryland Dep't of Human Res. v. Bo Peep Day Nursery*, 317 Md. 573, 597-98 (1989) ("Where . . . the license to engage in a regulated business may not be withdrawn at the discretion of the licensing authority but only upon proof of certain contingencies, the procedure by which a state undertakes to suspend or revoke the license is restrained by due process." (citation omitted)). Instead, the Board

12

contends that it complied with all statutory requirements of notice, whereas Ms. Sesay did not, in failing to provide notice to the Board of her change in address.

The State Board of Nursing is permitted to "reprimand any [nursing] licensee, place any licensee on probation, or suspend or revoke the license of a licensee if the . . . licensee" engages in prohibited conduct, including "[w]illfully and knowingly . . . [f]il[ing] a false report or record of an individual under the licensee's care"; acting "inconsistent[ly] with generally accepted professional standards in the practice of registered nursing or licensed practical nursing"; and "submit[ting] a false statement to collect a fee[.]" H.O. § 8-316(a)(5)(i), (8), (11). Before taking any of the aforementioned actions, the Board must "give the person against whom the action is contemplated an opportunity for a hearing before the Board." H.O. § 8-317(a). "The Board shall give notice and hold the hearing in accordance with the Administrative Procedure Act[,]" H.O. § 8-317(b), and the hearing notice "shall be sent by certified mail, return receipt requested, to the last known address of the person at least 30 days before the hearing." H.O. § 8-317(c).

The APA requires agencies like the Board to "give all parties in a contested case reasonable written notice of the hearing." Maryland Code (1984, 2014 Repl. Vol.), State Gov't Art. ("S.G.") § 10-208(a). Even where the licensing statute, such as H.O. § 8-316(c), "provides for service other than by regular mail," the agency may also send notice "by regular mail to the address of record of a person holding a license issued by the agency if: (1) the person is required by law to advise the agency of the address; and (2) the agency has been unsuccessful in giving notice in the manner otherwise provided by

13

the licensing statute." S.G. § 10-209(a). In this context, if the person served by regular mail shows that he or she "neither knew nor had reasonable opportunity to know of the fact of service," a hearing must be provided. S.G. § 10-209(b). The APA further provides:

> A person holding a license shall be deemed to have had a reasonable opportunity to know of the fact of service if:
> (1) The person is required by law to notify the agency of a change of address within a specified period of time;
> (2) The person failed to notify the agency in accordance with the law;
> (3) The agency or the Office mailed the notice to the address of record; and
> (4) The agency did not have actual notice of the change of address prior to service.

S.G. § 10-209(c).

It is undisputed that the Board complied with the aforementioned statutory requirements for proper notice. In fact, the Board sent the notice of hearing via both certified mail, required by the statute, and first-class mail, not required by statute. The issue in this case, however, is whether the Board was required to engage in additional measures beyond those required by the statute based on the circumstances presented.

In the context of notice, the Supreme Court has established that "[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) (citations omitted). To provide notice that meets constitutional muster, "[t]he means

14

employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it[,]" and

> [t]he reasonableness and hence the constitutional validity of any chosen method may be defended on the ground that it is in itself reasonably certain to inform those affected . . . , or, where conditions do not reasonably permit such notice, that the form chosen is not substantially less likely to bring home notice than other of the feasible and customary substitutes.

*Id.* at 315 (internal citations omitted). "There is no cookie cutter paradigm for determining the constitutionality of a particular procedure designed to convey notice [because] '[d]ue process is flexible and calls only for such procedural protections as the particular situation demands.'" *Griffin v. Bierman*, 403 Md. 186, 197 (2008) (quoting *Dep't of Transp. v. Armacost*, 299 Md. 392, 416 (1984)).

Instead, "[t]o determine whether notice in a particular case is constitutionally sufficient, the court must balance the interests of the state or the giver of notice against the individual interest sought to be protected by the [F]ourteenth [A]mendment." *Id.* (quoting *Miserandino v. Resort Props., Inc.*, 345 Md. 43, 53 (1997)) (internal quotation marks omitted). In this regard, the state is not required to demonstrate that it provided *actual* notice; rather, it must show that its notice was "reasonably calculated" to provide notice. *Id.* at 198. Generally, notice by mail is presumed to provide constitutionally sufficient notice. *Id.* (citations omitted); *see also Dusenbery v. United States*, 534 U.S. 161, 169-72 (2002) (upholding the state's delivery of notice via certified mail to a prisoner as "reasonably calculated" and in satisfaction of due process although the prisoner did not actually receive the notice).

In *Jones v. Flowers*, however, the Supreme Court addressed, for the first time, the issue of "whether due process entails further responsibility when the government becomes aware prior to the taking that its attempt at notice has failed." 547 U.S. 220, 227 (2006). In that case, the state mailed a letter notifying the petitioner of his tax delinquency and his right to redeem his property within two years via certified mail to petitioner's last known address, but the letter was returned, marked as "unclaimed." *Id.* at 223-24. Two years later, the state published a notice of public sale in the newspaper, and, upon receiving an offer, mailed a notice of tax sale, again via certified mail, to petitioner at the same address. This letter was also returned as "unclaimed." *Id.* at 224. Notice via first-class mail was not sent. After the property was purchased, the petitioner's daughter, who had received an unlawful detainer notice while residing at the address, finally notified petitioner of the sale, and the petitioner filed a lawsuit challenging, on due process grounds, the state's failure to provide sufficient notice. *Id.*

The Supreme Court concluded that "the State should have taken additional reasonable steps to notify [the petitioner], if practicable to do so" upon receiving the returned form indicating that the petitioner had not received the notice. *Id.* at 234. The Court began its analysis by recognizing that it "has deemed notice constitutionally sufficient if it was reasonably calculated to reach the intended recipient when sent" in cases in which "the government attempted to provide notice and heard nothing back indicating that anything had gone awry[.]" *Id.* at 226 (citations omitted). In the Court's view in this instance, however, "[a]lthough the State may have made a reasonable calculation of how to reach [the petitioner], it had good reason to suspect when the notice

16

was returned that [the petitioner] was 'no better off than if the notice had never been sent.'" *Id.* at 230 (quoting *Malone v. Robinson*, 614 A.2d 33, 37 (D.C. App. 1992)). "Deciding to take no further action is not what someone 'desirous of actually informing' [the petitioner] would do; such a person would take further reasonable steps if any were available." *Id.*

In so ruling, the Court rejected the state's argument that it was not required to engage in additional follow-up measures when the petitioner was under a statutory obligation to notify the state of his correct address and failed to do so. *Id.* at 231-32. Although the Court considered the statutory requirement that individuals keep their address up-to-date to "provide[] strong support" that sending the notice to the then-known address was a "reasonably calculated" method to reach petitioner, the Court found that the petitioner's failure to comply with that requirement did not "forfeit[] his right to constitutionally sufficient notice" and that the requirement "does not alter the reasonableness of the [state's] position that [it] must do nothing more when the notice is promptly returned 'unclaimed.'" *Id.* at 232.

In that respect, the Court concluded that there were several reasonable options for the state to have taken. To address the possibility that the petitioner still resided at the address but was not at home at the time the certified mail was delivered, the State could have mailed a notice to the petitioner via first-class mail. *Id.* at 234. The Court observed that "the use of certified mail might make actual notice less likely in some cases-the letter cannot be left like regular mail to be examined at the end of the day, and it can only be retrieved from the post office for a specified period of time." *Id.* at 235. Moreover,

"[f]ollowing up with regular mail might also increase the chances of actual notice to [the petitioner] if-as it turned out-he had moved" because "[e]ven occupants who ignored certified mail notice slips addressed to the owner (if any had been left) might scrawl the owner's new address on the notice packet and leave it for the postman to retrieve, or notify [the petitioner] directly." *Id.* To address the possibility that the petitioner had moved, the Court opined that the state could have posted a notice on the front door or addressed the undeliverable mail to the "occupant." *Id.*

The Court rejected the petitioner's argument that the state could have searched for the petitioner's address in the phonebook or other government records, because the return of the notice as "unclaimed" "merely informed the [state] that no one appeared to sign for the mail before the designated date on which it would be returned to the sender[,]" not that the address was necessarily incorrect. *Id.* at 235-36. Pertinent to the instant case is the Court's statement that "[a]n open-ended search for a new address-especially when the State obligates the taxpayer to keep his address updated with the tax collector . . . - imposes burdens on the state significantly greater than the several relatively easy options" suggested in its opinion. *Id.* at 236.

Therefore, although the Supreme Court did not prescribe the form of service that state governments should adopt, the Court determined that "[i]t suffices for present purposes that we are confident that additional reasonable steps were available for [the state] to employ before taking [the petitioner's] property." *Id.* at 238.

In *Griffin v. Bierman*, 403 Md. 186 (2008), the Court of Appeals had the opportunity to determine whether to apply the principle set forth in *Jones* to the facts

18

before it.  In that case, Griffin, a property owner, defaulted on the loans financing her home.  *Id.* at 191.  The substitute trustees under the deed of trust for the property docketed a foreclosure action and sent a notice of such to Griffin via certified mail and first-class mail.  *Id.* at 192.  The letter sent by certified mail was returned as "unclaimed," and the letter sent by first-class mail was not returned.  *Id.* at 193.  When it came time to foreclose upon the property, the trustees mailed, again, first-class and certified mail of the time, date, and location of the foreclosure sale as well as a letter addressed to the "occupant" of the residence via first-class and certified mail.  *Id.* at 193-94.  The certified letter addressed to the occupant was returned as "unclaimed," but none of the first-class mailings were returned to the trustees.  *Id.* at 194.  When Griffin learned of the foreclosure sale, she filed exceptions on the ground that the sale violated her due process rights due to lack of sufficient notice, but the sale was ratified.  *Id.*

The Court of Appeals concluded that the notice provided to Griffin, conducted pursuant the statutory foreclosure scheme, provided sufficient notice and was not unconstitutional.  *Id.* at 200.  The Court differentiated the case before it from *Jones*, concluding that the trustees did not have "certain knowledge" that Griffin did not receive the notices sent via both certified and first-class mail.  *Id.*  The Court explained that it was logical that a recipient of the notice sent first-class, which indicated that an identical notice was also sent via certified mail, would not make the effort to go to the post office and sign for a duplicate letter.  *Id.* Therefore, the Court concluded that the trustees in that case provided Griffin with due process by complying with Maryland's foreclosure notice requirements and also satisfied several of the alternative steps identified by the Supreme

19

Court in *Jones*. *Id.*; *see also Snider Int'l Corp. v. Town of Forest Heights, Md.*, 739 F.3d 140, 147 (4th Cir.) (rejecting a motorist's claim that notice of speeding infraction sent via first-class mail alone was insufficient to provide due process *where there was no indication that the delivery was not successful*, *i.e.*, the envelopes being returned as undeliverable), *cert. denied*, 134 S. Ct. 2667 (2014).

Notably, however, the Court of Appeals, in a footnote, indicated that its holding might have been different had the facts varied:

> Our holding would be different, however, had the first-class mail notices been returned undelivered or the certified mail had been returned as something more revealing than "unclaimed[.]" Had the Trustees known that their attempts to convey notice to Griffin failed, in accordance with *Jones*, reasonable follow-up measures to attempt to give notice to the interested property owner might be required.

403 Md. at 202 n.11 (internal citations omitted).[11] Indeed, the Court explained that "[i]f first-class mail is undeliverable, it is returned to the sender[;] [a]t which point, the sender knows that notice was not received." *Id.* at 206 n.14.

Here, the Board, like the trustees in *Griffin*, sent simultaneous, identical notices via both certified mail and first-class mail. Unlike *Griffin*, however, both notices were

---

[11] We note that, despite *Griffin's* language in footnote 11 stating that there would be a different result and additional follow-up measures might be required if both notices were returned undelivered, the precise factual situation described in that footnote was not before the Court in that case. As such, it was not necessary to reach the ultimate decision in *Griffin*, and that particular language is not controlling in the present case. *See Halliday v. Sturm, Ruger & Co., Inc.*, 138 Md. App. 136, 160 (2001) ("The term dictum is an abbreviated form of obiter dictum, which is translated as 'a remark by the way.' It refers to a statement made by a court 'incidentally or collaterally, and not directly upon the question before [it], or upon a point not necessarily involved in the determination of the cause....' Obiter dictum lacks the authority of adjudication." (internal citations omitted)).

returned as undeliverable. Although, at this point in our discussion, it would appear that, under *Jones* and *Griffin*, the State was required to do more to provide Ms. Sesay with notice of her hearing, however, the instant case is distinguishable in several compelling respects from *Jones* and *Griffin*. Those two cases, while informative, do not control the outcome of this case.

First, the General Assembly established a "constructive notice" statute in the licensing context—a provision not involved in the tax foreclosure context in Maryland. Here, the Board is specifically required to provide notice of the hearing by certified mail. H.O. § 8-317(c). In addition, the APA provides that a person with a license is deemed to have had a reasonable opportunity to know of the service if: (1) the person is legally required to notify the governing agency of a change of address within a specific time period, (2) that person failed to notify the agency, (3) the agency mailed the notice to the address it had on record, and (4) the agency did not have actual notice of the address change before service. S.G. § 10-209(c). Here, all four factors were satisfied based on the uncontroverted evidence. Ms. Sesay was required to notify the Board of her change of address pursuant to H.O. § 8-312(e) within 60 days of her change of address, and she failed to do so.[12] The Board mailed the notice to the address provided by Ms. Sesay in her request for a hearing via first-class mail, in addition to the statutorily required certified mail. Finally, the Board did not have actual notice of Ms. Sesay's change in address before sending the hearing notice. Thus the Board fulfilled, and even went

---

[12] In fact, Ms. Sesay did not notify the Board until September 26, 2013, nearly eleven months after she was required to notify the Board of her change of address.

21

beyond, its statutory duty in this context, and there was no such constructive notice statute in *Jones*.

We recognize that failure to comply with one's statutory duty to provide notice of his or her change of address does not forfeit one's right to constitutionally sufficient notice. *See Jones*, 547 U.S. at 232. Unlike in *Jones*, however, here the Board sent both certified mail *and* first-class mail. Moreover, Ms. Sesay knew that there were charges pending against her, yet she did not inform the Board of her change of address to allow her to stay abreast of the proceedings. In *Jones*, the petitioner was not aware, like Ms. Sesay, of any pending charges; the state was sending notices of tax delinquency to the petitioner's former address. *Id.* at 223. Adopting Ms. Sesay's argument could provide an incentive to licensees in the midst of administrative proceedings in which charges have been brought against them—or even before any such proceedings commence if they believe charges may be brought—to fail to update their address with the appropriate regulatory body. By doing this, the licensee would be able to prevent the administrative body from demonstrating proper notice, and as a result, guarantee them more time, an additional hearing, or perhaps a way to avoid the charges altogether. Indeed, in the instant case, the record shows that Ms. Sesay continued working as a nurse for years after the charges were made against her.

The second reason *Griffin* and *Jones* are not controlling here is because those cases involved the sale of an individual's real property; in both cases, houses were to be sold. *Jones* was a property tax sale case, and the holding of *Jones* is set specifically in

the context of tax sales of real property.[13]  *Griffin* was a foreclosure case.  *Griffin*, 403

Md. at 192-194.   In *Jones*, the Supreme Court stated that "the State is exerting

*extraordinary power* against a property owner-taking and selling a house he owns."

*Jones*, 547 U.S. at 239 (emphasis supplied).  As the Court of Appeals has stated, "[i]t is .

. . true that the more significant the interest at stake, the greater the required certainty that

the notice will be effective."  *Golden Sands Club Condo., Inc. v. Waller*, 313 Md. 484,

501 (1988) (citing Laurence Tribe, *American Constitutional Law* § 10-15 at 733 (2d ed.

1988)) (case set in the context of a lien on a condominium unit, also real property).  Thus,

it stands to reason that in situations in which a person's real property, his or her home, is

being taken, greater certainty that notice will be effective would be required than in the

context of licensure.

We also note that administrative hearings are different from judicial proceedings

in that the due process and notice requirements may be tailored to the nature of the

circumstance by the legislature.   *Pitsenberger v. Pitsenberger*, 287 Md. 20, 30

(1980) (internal   citations   omitted)   ("At   a   minimum, due process requires   that   a

deprivation of property be preceded by notice and opportunity for hearing appropriate to

the nature of the case.").

> [T]he heart of the requirement of notification in administrative proceedings
> [is that] the noticee should be apprised clearly of the character of the action
> proposed  and  enough  of  the  basis  upon  which  it  rests  to  enable  him

---

[13] *See Jones*, 547 U.S. at 225 ("We hold that *when mailed notice of a tax sale* is returned unclaimed, the State must take additional reasonable steps to attempt to provide notice to the property owner before selling his property, if it is practicable to do so." (emphasis supplied)).

intelligently to prepare for the hearing. If this minimum requirement is met, **the notification is adequate, no matter how much it may fall short of the standards of pleading in judicial contests.**

*O'Donnell v. Basslers, Inc.*, 56 Md. App. 507, 519 (1983) (emphasis added) (quoting *Cassidy v. Cnty. Bd. of Appeals of Baltimore Cnty.*, 218 Md. 418, 424 (1958) (specifically discussing the requirements for legally sufficient notice in administrative proceedings, but not addressing constitutional due process). Further, when the legislature crafts a statutory scheme for a specific context, such as administrative proceedings, compliance with that statutory scheme will usually satisfy due process. *Vito ex rel. Vito v. Klausmeyer*, 216 Md. App. 376, 385 (2014). Thus, in drafting the APA to allow for constructive notice in the licensing context, the General Assembly provided agencies such as the Board with alternative methods to satisfy due process—methods not found in the judicial context.

Third and most importantly, this case implicates health licensure, a domain wherein "the State has a significant interest in protecting its citizens and the public health." *Dr. K.*, 98 Md. App. at 120.[14] The Board monitors and investigates violations of the applicable nursing standards in an effort to safeguard public health. With regard to the regulation of doctors, another medical profession, the Court of Appeals has said that:

> [N]o person has an absolute vested right to practice medicine, but only a conditional right which is subordinate to the police power of the State to protect and preserve the public health. The State, in the performance of its duty to protect and preserve the public health, has the power, within

---

[14] *See also* H.O. § 1-102(a) ("It is the policy of the State that health occupations should be regulated and controlled as provided in this article *to protect the health, safety, and welfare of the public*." (emphasis supplied)).

> constitutional limitations, to regulate the practice of medicine by those engaged therein. This regulatory power is justified by the fact that the practice of medicine requires special knowledge, training, skill and care, that health and life are committed to the physician's care, and that patients ordinarily lack the knowledge and ability to judge his qualifications.

*Id.* (quoting *Stillman*, 291 Md. at 405-06). Thus, the State has an immense public interest in regulating the medical professions in order to keep the public safe. In *Jones* and *Griffin*, there was not such a State interest in the protection of the public; instead, people's houses were being taken, which is an area in which the property owner has a paramount interest. The State has a greater interest in health licensure than in foreclosure or tax sales.

Pursuant to these distinctions that separate the present case from *Jones* and language in *Griffin*, we are satisfied that the Board's attempts at notice in the present case survive constitutional scrutiny. Here, the notice was "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Jones*, 547 U.S. at 226 (quoting *Mullane*, 339 U.S. at 314). We hold that the circuit court erred in reversing the decision of the Board.

II. Substantial Evidence

The Board also contends that substantial evidence supports the Board's finding that Ms. Sesay violated certain provisions of the Nurse Practice Act.[15]

---

[15] For the sake of completeness, we note that the circuit court made no finding on the substantial evidence issue because its finding on the notice issue made a finding on substantial evidence unnecessary.

25

"Generally, judicial review of an administrative agency's action 'is limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law.'" *Regan v. Bd. of Chiropractic Examiners*, 120 Md. App. 494, 508 (1998) (quoting *United Parcel Service, Inc. v. People's Counsel for Baltimore Cnty.,* 336 Md. 569, 577 (1994)), *aff'd sub nom. Regan v. State Bd. of Chiropractic Examiners*, 355 Md. 397 (1999). "[I]f reasoning minds could reasonably reach the conclusion reached by the agency from the facts in the record, then it is based upon substantial evidence, and the court has no power to reject that conclusion." *Liberty Nursing Ctr., Inc. v. Dep't of Health & Mental Hygiene*, 330 Md. 433, 443 (1993) (citation omitted). "When, however, the issue before the agency for resolution is one solely of law, ordinarily no deference is appropriate and the reviewing court may substitute its judgment for that of the agency." *Id.* (citation omitted).

Here, a reasoning mind could reasonably reach the same findings as the Board did. The evidence the Board considered at the hearing amounts to substantial evidence that Ms. Sesay violated H.O. §§ 8-316(a)(5)(i), (8), and 8-316(a)(5)(i) and (11).

The Board heard telephonic testimony from Ms. C. that, at 11:00 p.m. on the date in question, the patient was yelling loudly enough to awaken Ms. C.'s husband, who then found Ms. Sesay sleeping on the floor. Ms. C. further testified that, at around 2:00 a.m., the patient's yelling again awakened Ms. C.'s husband and son, who again discovered Ms. Sesay asleep. The Board also accepted into evidence Ms. C.'s complaint that she submitted to the Board of Nursing, describing the same events, a picture that purports to

26

be Ms. Sesay sleeping on the floor, and statements from Ms. C.'s husband and two sons that all relate the same story.

Ms. C. also testified that, after she dismissed Ms. Sesay for sleeping around 2:15 a.m., Ms. C noticed that Ms. Sesay had stated on her "Adult Extended Hour Nursing Flow Sheet" that she left the C. home at 6:30 a.m. and claimed that she performed several tasks that she did not perform. The flow sheet that is alleged to be fraudulent was also accepted in to evidence.

The Board also heard testimony from Stephanie Nogle, an investigator for the Board, who testified regarding her investigation of the complaint that Ms. C. submitted to the Board, the circumstances of Ms. Sesay's conditions of employment with her former nursing employer, and her interview of Ms. Sesay. The Board accepted into evidence a report that Ms. Sesay refused to meet with Maxim, her former employer, regarding the incident at the C. household. A reasoning mind could infer that Ms. Sesay would rather be dismissed than address her poor performance at the C. residence. Due to these events, Ms. Sesay is ineligible for rehire with Maxim.

The Board judged the credibility of Ms. C. and Ms. Nogle and was free to credit the testimony of the witnesses, as well as the exhibits submitted. We hold that substantial record evidence supported the Board's findings that, by falling asleep while caring for a quadriplegic patient and falsifying that patient's medical records to bill for time in which she was not working, Ms. Sesay violated the Maryland Nurse Practice Act.

In summary, contrary to Ms. Sesay's contentions, the Board, in adhering to the APA's constructive notice statute, S.G. § 10-209(c), provided Ms. Sesay with legally

sufficient notice. Second, substantial record evidence also supports the Board's findings that Ms. Sesay's actions violated the Nurse Practice Act. For the foregoing reasons, the judgment of the Circuit Court for Montgomery County is reversed.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY REVERSED. CASE REMANDED TO THAT COURT FOR THE ENTRY OF A JUDGMENT AFFIRMING THE ORDER OF THE MARYLAND BOARD OF NURSING.**

**COSTS TO BE PAID BY THE APPELLEE.**