Circuit Court for Harford County
Case No. 12-C-14-001972

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1671

September Term, 2015

_____

MARYLAND REAL ESTATE COMMISSION

v.

GEORGEANNA GARCEAU

_____

Woodward, C.J.,
Leahy,
Reed,

JJ.

_____

Opinion by Leahy, J.

_____

Filed: September 1, 2017

The issues in the underlying administrative appeal boil down to three. First: can a real estate broker, Georgeanna Garceau (Appellee and Cross-Appellant), be found negligent for failing to disclose the existence of a non-existent homeowners association? We don't think so. Second: can Ms. Garceau be held negligent for failing to disclose potential well-water contamination in the neighborhood? We determine she can. And third: was the sanction imposed by the Maryland Real Estate Commission ("MREC") (Appellant and Cross-Appellee) on Ms. Garceau in this case arbitrary and capricious? Under the circumstances, the answer is yes.

## BACKGROUND

### A. Prologue

On or about May 17, 2009, Victor and Eileen Yancone (collectively, the "Sellers") entered into a contract of sale for residential property located at 2828 Cross Country Court, Fallston, Maryland (the "Property"), within a subdivision called Cross Country Estates, with Tim Willig and Debra Perseghin (collectively, the "Buyers"). Ms. Garceau served as the listing broker for this transaction.

The Buyers complained that Ms. Garceau failed to disclose that (1) there was a putative homeowners association ("HOA") operating in the neighborhood and (2) there was potential well-water pollution in the neighborhood relating to an ExxonMobil gas leak. But before we begin the saga of Ms. Garceau's journey to this point, we render a short prologue.

On August 14, 1975, Leo Umerly executed a "Declaration of Restrictions" (the "1975 Declaration") for plats one through four in Cross Country Estates and recorded this

document in the office of the Recorder of Deeds for Harford County, Maryland. This document established certain protective covenants and restrictions for the lots, including the Property. The covenants governed such things as (1) the number of dwellings, (2) the number and type of animals, and (3) the number and size of vehicles allowed on each lot. The 1975 Declaration, signed by Leo Umerly and notarized, *did not establish an HOA*. Notably, the 1975 Declaration states that "[t]he provisions herein contained shall run with and bind the land hereby conveyed for a period of thirty (30) years[.]" Thus, by its own terms, the 1975 Declaration expired in August 2005.

On October 16, 2006, after the expiration of the 1975 Declaration, a second "Declaration of Restrictions" (the "2006 Declaration") was filed in the land records of Harford County. This 2006 Declaration stated that "Cross Country Estates Community Association, Inc. controls this declaration of restrictions as defined by the Maryland Homeowners Association Act." The 2006 Declaration purported to govern the same general topics as the 1975 Declaration did. The last page was signed, "Beth F. Scheir, Vice President of CCECA," but was not notarized. It was revealed during the course of the underlying litigation, that the Cross Country Estates Community Association ("CCECA") is a neighborhood association, not an HOA, and the only declaration of restrictions that governed the neighborhood—the 1975 Declaration—expired in 2005.

**B. The Residential Real Estate Transaction and Complaint**

In early 2009, the Buyers were interested in purchasing a house and hired William Fischbein, of Litehouse Realty, as their agent. They informed him that they were not interested in properties subject to an HOA, in part because they wanted to build a fence for

2

their dogs and had bad experiences in this regard in their prior residence. The Buyers became interested in purchasing the Property, so Mr. Fischbein contacted Ms. Garceau of Garceau Realty, who was the listing agent. Mr. Fischbein maintained, in the subsequent investigation, that the existence of an HOA fee or potential groundwater pollution was not disclosed to him, but that he did not specifically ask Ms. Garceau about an HOA because the existence of an HOA was not on any paperwork.[1] The Metropolitan Regional Information Systems ("MRIS") report did not state that the Property was subject to an HOA or an HOA fee.

Before closing on the Property, the Buyers had a standard well inspection performed, but that inspection did not test the water for contaminants. On May 17, 2009, the Buyers and the Sellers executed the contract for sale of the Property for a purchase price of $439,900.00. The sales contract included a Maryland Homeowner's Association disclosure form, which was crossed out with a handwritten "NO HOA."[2]

---

[1] The record includes a May 13, 2009, email from Ms. Garceau to the Yancones (Sellers), apparently sent after the Buyers asked a number of questions concerning the Property, including a question regarding any restrictive covenants. Ms. Yancone responded that "[v]ery limited covenants exist in the Cross Country Estates Community Association. They are on file with county." The record is equivocal as to whether this email was forwarded to Mr. Fischbein or the Buyers.

Ms. Garceau's email to the Sellers also inquired as to when the well was sampled last. Ms. Yancone responded: "November 5, 2008, results negative."

[2] Also, in the contract of sale, the Buyers assumed responsibility for environmental matters and specifically acknowledged that Ms. Garceau and the Sellers were not making any representations about environmental matters and water quality. In particular, the contract stated that "[i]t [wa]s the responsibility of the Buyer to determine for himself/herself the presence and/or significance of potentially environmentally hazardous activities on or about a property." It then listed several state and local authorities that the

On June 29, 2009, the Buyers moved onto the Property, and they began to install ground posts for a fence. Three days later, a representative of the CCECA hand-delivered the Buyers a copy of the 2006 Declaration and a letter stating:

> Hello Neighbors,
> Welcome to Cross Country Estates! We hope you enjoy the neighborhood.
> We assume that the realtors involved or the previous owner made you aware of the neighborhood association covenants, however a copy has been attached for your records. Both the By-Laws and Covenants are filed at the Harford County Courthouse Land Record department and Home Owner Depository. We have a minimal annual association fee of $10. All property owners are bound by the agreements of the homeowners association. As a new property owner of CCE you are eligible to become a voting member of the association upon payment of the $10 fee.

Several months after the Buyers moved onto the Property, a company engaged by ExxonMobil arrived at the Property to test the water for possible pollution caused by ExxonMobil. The arrival of this inspector was the first time the Buyers became aware of possible well-water contamination at the Property.

On March 9, 2010, the Buyers filed with MREC a complaint against Ms. Garceau for her conduct in the real estate transaction: namely, for failing to disclose the existence of potential well contamination stemming from the ExxonMobil leak, and for "[n]o disclosure in listing/contract of an HOA[.] We were looking ONLY at homes w/out an

---

buyer could call for help in investigating "the possibility of existence of such environmentally hazardous materials and activities[.]"

4

HOA." MREC denied the Buyers' guaranty claim,[3] but determined that it would proceed with an administrative claim against Ms. Garceau.

## C. The Investigation

Ms. Garceau responded to the Buyers in a letter dated March 31, 2010, stating:

> The [Buyer]s claimed that no disclosure was made of an HOA. There is a [CACCE]. In our listing agreement the sellers signed off that there was no HOA, there are Declaration of Restrictions. I have attached several recent listings from the community; listings from several brokerages all of which state there is no HOA fee, the only exception being one of my previous listings reflecting the $10 voluntary fee.[4]
>
> On 5/14/09, prior to the contract ratification date of 5/17/09, seller Eileen Yancone responded to several of the [Buyers'] questions. The potential buyers asked, "Are there any restrictions with regard to putting up fences, putting in plantings or gardens, building outbuildings like a garden shed, satellite dishes, etc?" The sellers responded, "Very limited covenants exist in the Cross Country Estates Community Association. These are on file with the county." In addition, we sent the potential buyers the attached Declaration of Restrictions.
>
> The potential buyers also inquired about the well on 5/14. They asked "When was the well last sampled and what were the results?" Eileen Yancone responded "November 5, 2008, results negative." Per seller, there was no water problem at the time of the listing, and the owners did not experience potability problems prior to that. The buyer had the well tested on 5/19/09, all results passed and the buyer by their own admission states there is nothing wrong with the water. The listing broker/agent was not aware of any monitoring of water at 2828 Cross Country Court until this complaint surfaced.
>
> According to the appraisal conducted on 6/10/09, the HOA fee was non applicable. The appraiser also noted that there were "No neighborhood factors that would have a negative impact on marketability." In closing,

---

[3] Pursuant to Maryland Code (1989, 2010 Repl. Vol.), Business Occupations and Professions Article ("BOP"), § 17-404, a person may, under certain circumstances, recover compensation from the Real Estate Guaranty Fund, § 17-402, for actual losses.

[4] This apparently refers to an instance in 2008, when Ms. Garceau, then with the brokerage firm Yermen, Witman, Gaines and Garceau, LLC, served as the listing broker for Andrea Swift as she purchased a house in the same community as the Property. The MRIS report for the property listed an "HOA Fee" of "$10.00/ Monthly."

Garceau Realty did not have any information that was withheld at the time of the listing or contract acceptance.

(Internal citations omitted).

Robert J. Oliver, an MREC employee, investigated the Buyers' complaint from June 17 to July 19, 2010. His report states that he interviewed the Buyers and that they told their broker, Mr. Fischbein, that they were interested only in properties not subject to an HOA because they wanted to build a fence for their dogs. The Buyers told Mr. Oliver that they had not seen a series of emails between Ms. Garceau and the Sellers concerning restrictive covenants or potential well-water contamination. Mr. Oliver reported that he showed the Buyers the 1975 Declaration, but that the Buyers did not recall seeing it before. His report notes the Buyers were unaware of any HOA until July 2, 2009, when they received a letter from the CCECA, and that they learned of the potential well contamination when they received the letter from ExxonMobil about testing on October 26, 2009.

According to his report, Mr. Oliver then interviewed Ms. Garceau. She informed him that she was on vacation for part of the transaction and that her assistants, Jessica Boyle and Julie Bleuel, represented her when she was gone. Ms. Garceau was aware that the Buyers did not want a property covered by an HOA, but "the seller said there was no HOA and wrote 'NO HOA' across the MD Homeowners Act Disclosures to Buyer Document." Ms. Garceau provided Mr. Oliver a copy of the contract checklist with HOA marked "N/A," and informed him that "she was not aware of the existence of a community association." When Mr. Oliver told Ms. Garceau that another property on the street that she sold in the past indicated that there was an HOA fee of $10, Ms. Garceau explained

that "at the time the fee was voluntary and depended on the seller to inform her if they were a member of an association or not" and that "legally there is no HOA covering the property." She added that the appraisal for the Property indicated there was no HOA fee." Ms. Garceau was aware of the 2006 Declaration and said she provided a copy to the Buyers on May 14, 2009, when she answered their questions about other restrictions and well testing.

Ms. Garceau, who lived within a mile of the Property, also admitted to knowing about possible well contamination in the area, saying "everyone living in the area is aware of the dangers associated with the leak." In her affidavit, however, Ms. Garceau explained that it was not until the Fall of 2011 that she received a letter informing her that she "became" a class member in the class action against ExxonMobil that resulted from this spill. *See Exxon Mobil Corp. v. Ford,* 433 Md. 426, 435–37, *as supplemented on denial of reconsideration,* 433 Md. 493 (2013); *Exxon Mobil Corp. v. Albright*, 433 Md. 303, 316–17, *on reconsideration in part,* 433 Md. 502 (2013).

Mr. Oliver then interviewed Mr. Fischbein, who told him that (1) the Buyers informed him that they did not want property with an HOA; (2) the existence of an HOA was never disclosed to him or to the Buyers; and (3) "[h]e never asked [Ms. Garceau] specifically about the subject because there ha[d] been no disclosure in the contract or in the MLS documents." Mr. Fischbein stated that he received no documentation of any restrictions on the Property, and the potential water pollution was not disclosed to him. He denied knowledge of any class action lawsuit or any well-water contamination.

7

## D. The Statement of Charges

On November 8, 2010, MREC issued a statement of charges (the "Charging Document") against Ms. Garceau. The Charging Document identified Ms. Garceau as the listing broker and seller's agent, alleging that: (1) the Buyers were interested only in properties not subject to an HOA and that Ms. Garceau was aware of that preference; (2) Ms. Garceau "was aware, or should have been aware, that the Cross Country Court property was part of a homeowners, or community, association and that the property was governed by a Declaration of Restrictions"; and (3) Ms. Garceau "did not disclose the existence of the homeowners, or community, association or the Declaration of Restrictions[5] to the buyers or their real estate agent prior to settlement." The Charging Document then stated that the Buyers would not have purchased the Property had they known of the HOA.

The Charging Document alleged further that the Property "was subject to periodic testing of well water by ExxonMobil for possible contamination" associated with a gasoline leak and related litigation, and that Ms. Garceau lived and provided real estate brokerage services near the Property. Therefore, the Document alleged that Ms. Garceau "knew, or should have known, of the possible contamination and well testing as well as the litigation[,]" and that Ms. Garceau did not disclose this information. The Buyers would not have purchased the Property, according to the charges, had they known this information.

---

[5] It is not clear from the record whether the "Declaration of Restrictions" referred to in the statement of charges refers to the 1975 Declaration or the 2006 Declaration; however, in his proposed order, the administrative law judge charged Ms. Garecau with failing to disclose the 2006 Declaration.

8

Finally, the Charging Document "alleged that [Ms. Garceau's] conduct amounted to bad faith, incompetency, and/or untrustworthiness, as well as improper dealings." For the failure to disclose these two issues, MREC charged Ms. Garceau with violations of Maryland Code (1989, 2010 Repl. Vol.), Business Occupations and Professions Article ("BOP"), § 17-322(b)(4),[6] (25),[7] and (33),[8] as well as violations of Code of Maryland Regulations ("COMAR") 09.11.02.01A and D.[9] The Charging Document informed Ms.

---

[6] Pursuant to BOP § 17-322, the Commission may "deny a license to any applicant, reprimand any licensee, or suspend or revoke a license[,]" under certain delineated circumstances. Specifically, the Commission may impose any of these sanctions under BOP § 17-322(b)(4) if a licensee "intentionally or negligently fails to disclose to any person with whom the applicant or licensee deals a material fact that the licensee knows or should know and that relates to the property with which the licensee or applicant deals[.]"

[7] This section provides for sanctions if a licensee "engages in conduct that demonstrates bad faith, incompetency, or untrustworthiness or that constitutes dishonest, fraudulent, or improper dealings[.]" BOP § 17-322(b)(25).

[8] This section provides for sanctions if a licensee "violates any regulation adopted under this title or any provision of the code of ethics[.]" BOP § 17-322(b)(33).

[9] The Charging Document charged Ms. Garceau with violating COMAR 09.11.02.01 A and D; however, the administrative law judge's subsequent order found that she violated COMAR 09.11.02.01 A *and B* in his findings, but, in his conclusions, stated that she violated 09.11.02.**02** A and B. MREC's first final order states, in its conclusions, that she violated COMAR 09.11.02.**01** A and B, but, then, in the next paragraph, apparently referring to the previous paragraph, mislabels it 09.11.02.**02** A and B.

The second final MREC order, from which the underlying petition for judicial review was noted, is consistent in its reference to COMAR 09.11.02.01A, and that is the only COMAR provision that MREC found Ms. Garceau violated under the second order. We, in turn, will limit our discussion and analysis to the charge that Ms. Garceau violated COMAR 09.11.02.01A.

COMAR 09.11.02.01A provides that "The licensee shall remain informed of matters affecting real estate in the community, the State, and the nation."

Garceau that there would be a hearing on the charges, which could result in a reprimand, suspension or revocation of her license, and/or a penalty of $5,000.00 for each violation.

### E. The Administrative Hearing

On June 3, 2011, an administrative law judge ("ALJ") from the Office of Administrative Hearings ("OAH") held a hearing on the charges against Ms. Garceau. The Assistant Attorney General prosecuting the MREC complaint (hereinafter "Presenter")[10] called Mr. Willig as a witness. He testified that Ms. Garceau never disclosed, in her property listing or communications, that there was an HOA;[11] and that he had told Mr. Fischbein of his desire not to purchase a residence subject to an HOA. He also stated that he received a declaration of restrictions purporting to govern the Property—after purchasing the Property—once he started constructing a fence on the Property. He further stated that he and his wife had been paying a $10.00 annual fee, and he stated that, although he had not consulted a lawyer, he believed that he was bound by the declaration of restrictions. He further testified that he and his wife would not have purchased the house, had they known about an HOA "[b]ecause [they] did not want an HOA."

---

[10] COMAR 09.01.02.02(B)(17) provides that "'Presenter of evidence' means the attorney assigned by the Office of the Attorney General to: (a) Present charges and evidence against a respondent or applicant; or (b) Represent the interests of a guaranty fund." By contrast and in the context of this proceeding, the term "Counsel" means the attorney assigned by the Office of the Attorney General to provide advice to MREC. *See* COMAR 09.01.02.02(B)(10).

[11] The Property's listing contains only blank spaces next to anything marked "HOA." The MRIS reports also do not disclose any HOA.

Mr. Willig then testified that no one advised him before he and his wife purchased the house that there was an ongoing lawsuit relating to gasoline contamination in the neighborhood. He explained that he was informed of the potential problem when a company engaged by ExxonMobil showed up at the Property to test for contamination. Similar to the HOA issue, Mr. Willig testified that he and his wife would not have purchased the Property had they known about the ExxonMobil gas leak and the potential well-water contamination issue and that his wife refused to drink the water from the house.

After calling Mr. Fischbein, who attested to the same facts he related during the investigation, the Presenter called Andrea Swift, who, as mentioned previously, purchased a house in 2008 on Cross Country Court. She testified that Ms. Garceau was the listing broker for the house she purchased and that the listing contained an HOA fee of $10.00 a month and that Ms. Garceau's office "sent [her] the bylaws." She further testified that there was an active neighborhood association in the Cross Country Estates neighborhood. She also stated that there were trace amounts of the pollutant in the water at her house and that Ms. Garceau never provided information on the potential water pollution.

Ms. Garceau did not testify in her own defense. In closing, the Presenter argued that Ms. Garceau failed to disclose a material fact to the Buyers by failing to inform them of the HOA, and asserted that "when I use the term 'HOA,' I am referring to not just a[] homeowners association, but also any type of neighborhood association or declaration of restrictions of covenants." The Presenter argued that there had been no court decision stating that CCECA was not a valid HOA and that CCECA certainly seemed to be an active

association that accepts dues and takes votes on issues. As to the well contamination issue, the Presenter argued:

> In addition, there was a failure to disclose the issue of the well contamination, the fact of the testing, the fact of the class action litigation. And I would argue that even if Ms. Garceau didn't have specific knowledge of it, she had been the listing agent for many properties in that community and development, and the law does require -- specifically COMAR 09.11.02.01A, which is one of the charges in this case -- that a licensee shall remain informed of matters affecting real estate in the community, the state, and the nation.
> If you are selling real estate in a community where a major gas company has caused a leak and that leak is the subject of class action litigation and the whole community, it sounds like, is involved in that litigation, that is something that, as a real estate broker, you have an obligation to know or be informed about. The [Sellers] were part of the class action litigation. . . . She should have known that information. She should have disclosed that information. It simply was not disclosed, and, therefore, there is a violation of Section (B)(4), an intentional or negligent failure to disclose a material fact that relates to the property, and it's to the material facts I've been discussing.

The Presenter then requested a 14-day suspension and a $4,000.00 penalty.

In his closing, counsel for Ms. Garceau argued that there was no enforceable declaration of restrictions and that the Property was not subject to a legal HOA under the Maryland Homeowners Association Act. He argued further that Ms. Garceau had no knowledge of the well contamination issue and that there was no evidence in the record to support her knowing it, and that the Buyers had contractually waived any recourse for water pollution in the sales contract. Ms. Garceau's counsel emphasized that there was no contamination on the Property because every test had negative results.

In rebuttal, the Presenter argued that contractual arguments were beside the point because MREC's disciplinary power is not coextensive with contractual immunity.

12

## F. New Evidence

On June 15, 2011, counsel for Ms. Garceau sent a letter to the four putative officers of the CCECA, stating that it was "[his] legal opinion that there is no valid formal Homeowner's Association regulated by the Maryland Homeowners' Association Act in the Cross Country Estates Development [and that i]t is further [his] legal opinion that there are no restrictive covenants binding upon owners of lots in the Cross Country Estates Subdivision." In his letter, he stated that by acting as an HOA, the CCECA officers may be found liable for negligent misrepresentation and, if they continue to do so, they may be found liable for intentional misrepresentation. He further suggested they retain an attorney to explore whether there is a valid HOA governing the community. He then provided his reasons why there was no HOA, including (1) his investigations on SDAT; (2) the expiration of the 1975 Declaration of Restrictions; and (3) the defective nature of the 2006 Declaration.

On June 29, 2011, the CCECA officers responded to Ms. Garceau's counsel via letter, acknowledging that CCECA was not a valid HOA within the definition of the Maryland Homeowners Association Act, Maryland Code (1974, 2015 Repl. Vol.), Real Property Article, § 11B-101:

> On behalf of the . . . CCECA[], we are writing in response to your letter of June 15, 2011. Your letter raises issues that we were not aware of, so we sought the advice of legal counsel in order to determine our correct and current legal status. **Based upon that consultation, and despite our good faith belief to the contrary, it appears that CCECA is a community association and not an official "homeowners" association.** In light of that fact, and again, despite our good faith belief to the contrary, **it also appears that the covenants and restrictions which were put into effect at the time that our neighborhood was established have expired and *there are no***

13

***current valid or enforceable restrictions in effect beyond those that would be imposed by county regulations.***

(Emphasis added).

On July 12, 2011, Ms. Garceau's counsel sent the June 15 and 29 letters to the Buyers, copying the MREC Presenter. He stated that this confirmed that there was no HOA and no valid or enforceable restrictions in effect in Cross Country Estates. The letter then demanded that they dismiss the action against Ms. Garceau. Six days later, the Presenter sent the ALJ a letter informing him of the results of Ms. Garceau's counsel's continued research into the matter of whether the Property is subject to an HOA.

### G. The ALJ's Proposed Decision

On August 30, 2011, the ALJ issued his recommended decision. The ALJ stated that he would consider only the information presented at the hearing and not consider any information submitted post-hearing because neither party requested that the case be reopened for submission of further evidence.

First, the ALJ found that, in 2009, the Buyers retained Mr. Fischbein as their buyer's agent and communicated to him "that they were specifically looking for property not covered by a homeowner's association [] or a Declaration of Restrictions." He also found that Mr. Fischbein made Ms. Garceau's assistant, Jessica, aware of the Buyers' reticence to purchase a home subject to an HOA; that Mr. Fischbein asked Jessica whether the Property was subject to an HOA; and that both Jessica and the Property's listing indicated that the Property was not subject to an HOA. The opinion further provided that Ms. Garceau did not inform the Buyers that the Property was subject to an HOA or that a

14

declaration of restrictions applied to the Property; and that, if the Buyers had known that the Property was subject to a declaration of restrictions, they would not have purchased the Property because they wanted to build a fence for their dogs on the Property.

Next, the ALJ found that Ms. Garceau failed to provide the Buyers information concerning litigation against ExxonMobil regarding possible well contamination, and that this information was widely publicized in Fallston, where Ms. Garceau lives. The ALJ also noted that the Sellers were part of a lawsuit against ExxonMobil.

The ALJ further found that, three days after moving in, the Buyers "received information left at their home regarding a Cross Country Estates HOA, notice of restrictions and a request for $10.00 in annual association dues [and that t]he association also informed the [Buyers] that [they] were required to clear their fence plans with the association, which would then grant them a 'permit' for the fence." As further findings of fact, the ALJ stated the following:

> 23. There exists a Declaration of Rights document, filed with the Harford County, Maryland Land Records Office on October 16, 2006, which purports to apply protective covenants and restrictions upon properties located within the subdivision of Cross Country Estates in Harford County.
>
> 24. The HOA is run by association officers, who charge a $10.00 annual fee as a prerequisite for voting rights in the organization. The association addresses matters such as the . . . well water issue, disputes between neighbors and issues involving restrictions it enforces within the subdivision.
>
> 25. The [Buyers] pay the annual HOA fee, retain voting rights in the association and consider themselves subject to the restrictions imposed by the Declaration of Restrictions recorded with the Harford County Land Records Office in 2006.
>
> 26. As of the date of settlement and up until the date of this hearing, the Property's well has tested negative for contaminants.

The ALJ then "f[ou]nd that the [M]REC has established that [Ms. Garceau] violated the [BOP] Article as well as the Code of Ethics." Despite noting that "an issue exist[ed] with respect to the validity" of the 2006 Declaration, the ALJ found that the CCECA had held itself out as a legitimate HOA with the authority to enforce the declaration. And, despite the letter Ms. Garceau's attorney received from the CCECA officers declaring that there is no valid HOA or declaration of restrictions, the ALJ stated that neither Ms. Garceau nor the Buyers have taken legal action to challenge the CCECA's authority. The ALJ accepted MREC's position that this was not the proper forum to address whether "the HOA has the authority to enforce" the 2006 Declaration. Thus, the ALJ found, Ms. Garceau "*had an obligation to disclose the existence of the HOA and [2006 Declaration], the existence of which were material facts*" relating to the Property that Ms. Garceau knew or should have known. (Emphasis added). And, Ms. Garceau's "failure to disclose the existence of the HOA and [2006 Declaration] constitute[d] a violation of [BOP §] 17-322(b)(4)."

In regard to the well testing issue, the ALJ found that Ms. Garceau knew about the leak and the subsequent litigation. The ALJ found that negative well tests do not guarantee the lack of future contamination, despite only negative tests up to that point. On this issue, the ALJ stated the following:

> I find that the nondisclosure of the litigation and well testing constitutes a violation of [BOP §] 17-322(b)(4) . . . due to the intentional or negligent failure to disclose material information which [Ms. Garceau] knew. Similarly, the nondisclosure of these facts is conduct that demonstrates bad faith, in violation of [BOP §] 17-322(b)(25)[.]

16

Finally, I also find that [Ms. Garceau] violated COMAR 09.11.02.01 A and B because she has an obligation to remain informed of matters affecting real estate in the community and she failed to disclose[] the pending lawsuits and the contamination issue (regarding nearby properties) or obtain more information about the latter.

The ALJ then considered the factors listed in BOP § 17-322(c)[12] to determine the recommended sanction for Ms. Garceau. With respect to Ms. Garceau's failure to disclose "the existence of an HOA," the ALJ opined that (1) the violation was serious because the Buyers purchased the home and (2) were now "subject to restrictions they were hoping to avoid," but that Ms. Garceau's failure to disclose was not deliberate.

In regard to Ms. Garceau's failure to disclose the gas leak, the ALJ opined that it (1) was "likewise a serious violation" because nearby properties experienced contamination and (2) the Property may experience future contamination, and "[t]he fact that many property owners in the subdivision, including the former owners of the Property, are involved in a class action suit against ExxonMobil, negatively impacts property values in the subdivision." The ALJ added that, (3) "regardless of whether the Complainants' water is currently contaminated," Ms. Garceau's failure to disclose "demonstrate[d] a lack of good faith."

The ALJ noted that the Presenter established "no history of violations by [Ms. Garceau]." Considering these factors, the ALJ recommended a seven-day suspension and a $3,000.00 monetary penalty.

---

[12] These are (1) the seriousness of the violation; (2) the harm caused by the violation; (3) the good faith of the licensee; and (4) the history of previous violations by the licensee. BOP § 17-322(c)(1).

17

## G. MREC's Proposed Order and Ms. Garceau's Exceptions to It

On October 17, 2011, MREC issued its proposed order, adopting the ALJ's findings of fact, but amending its conclusions of law to state that Ms. Garceau was subject to sanction because she violated BOP §§ 17-322(b)(4), (25), and (33) and COMAR 09.11.02.02A and B. MREC also amended the sanction upward, from a suspension of seven days to 14 days, and from a monetary penalty of $3,000.00 to $4,000.00. MREC stated that it believed Ms. Garceau's conduct warranted a higher penalty because she "failed to provide *material* information" to the Buyers on two issues: "the existence of an HOA and the ongoing problems with well contamination in the area."

MREC found that Ms. Garceau was "inaccurate" when she informed the Buyers that there was no HOA and that her response to them was inconsistent with when she told Ms. Swift in 2008 that her property in the same community was subject to an HOA. Ms. Garceau's belief that the Buyers could successfully challenge the CECCA, MREC found, was a legal conclusion, not provided at the time of the sale. MREC also found, in regard to possible well contamination, that the Fallston gasoline leak was well known in the community, covered extensively in the media, and there was a pending class action lawsuit brought by local residents. Ms. Garceau "was aware of the leak and the litigation[, y]et she failed to disclose it" to the Buyers. MREC found that "[t]his was in blatant disregard of her duties as a real estate licensee and demonstrated at best incompetence."

Although the ALJ found that Ms. Garceau's failure to disclose the HOA was not deliberate, in part because she relied on the help of several assistants, MREC determined that the ALJ interpreted the licensing statute improperly, and that licensees have a statutory

18

duty to disclose "all material information," even if the Buyer's agent has not asked specifically. Thus, Ms. Garceau was required to disclose the HOA because she "had both actual and constructive knowledge of it." MREC concluded that "As a real estate licensee since 1986, and a broker since 2008, [Ms. Garceau] was well aware of her duty to disclose information to the [Buy]ers. She failed in two significant respects to fulfill that duty. [MREC] cannot find any good faith in her conduct."

Ms. Garceau filed exceptions to MREC's proposed order on November 8, 2011, arguing that the conclusions in the recommendation and proposed order were both factually and legally erroneous. Ms. Garceau argued, among other things, that disclosing the existence of an organization *purporting to be* an HOA would be a breach of the duty to her clients, the Sellers, not a breach of duty to the Buyers. She also insisted that the record contained no evidence that she knew about any well testing or environmental problems. She contended that the Sellers never told her about ExxonMobil's well testing because they did not think such information was important. Ms. Garceau maintained that the Buyers assumed all liability for water problems because they assumed express responsibility for such in the sales contract and that she complied with all disclosure requirements.

On January 3, 2012, Ms. Garceau filed a request for leave to introduce additional evidence. Ms. Garceau sought to introduce the evidence her counsel had discovered after the hearing before the ALJ, including the invalidity of the CCECA as an HOA; evidence that the purported HOA had subsequently disbanded; as well as the appraisal and title policy issued to the Buyers, neither of which stated that an HOA existed. She also sought to introduce evidence that the Andrea Swift listing was changed by an associate, without

19

Ms. Garceau's knowledge. Finally, Ms. Garceau sought to introduce evidence that counsel for the class action included property owners of all properties in the area as potential class members "without their knowledge or consent" and that the putative class was disbanded in October 2011. Ms. Garceau claimed that this new evidence would demonstrate that she did not have knowledge of the environmental problems concerning the water.

An exceptions hearing was held on January 18, 2012. The Commission declined to accept the new evidence because it stated that Ms. Garceau could have discovered this evidence before the original hearing.

On April 17, 2012, the Commission issued its final order, upholding its proposed order. MREC then considered the factors listed in BOP § 17-322(c) for the assessment of a monetary penalty, and, once again, imposed a 14-day suspension and a $4,000.00 fine.

**H. Circuit Court Proceedings, Remand, and More Circuit Court Proceedings**

On May 11, 2012, Ms. Garceau filed a petition for judicial review in the Circuit Court for Harford County. On March 31, 2014, the circuit court remanded the case to MREC to consider the new evidence it had previously declined to consider because, the court stated, "[t]here must be some degree of flexibility and a sense of fairness that is used when any rule or policy is implemented or interpreted." The court found that the new evidence

> clearly shows that there were no enforceable restrictions on the property and there is no properly organized or existing homeowner's association with any authority to create or impose restrictions on the home. To simply ignore these facts and impose a sanction based on a finding to the contrary is simply wrong.

20

The court held as a matter of law that MREC erred in not considering the new evidence and remanded the case back to MREC.[13]

On May 29, 2014, MREC issued its supplemental opinion and final order, stating that it considered the new evidence that Ms. Garceau sought to introduce. *Nonetheless*, MREC imposed the same 14-day suspension and a $4,000.00 fine. MREC concluded that, regardless of whether the HOA was legally operating as an HOA, it was functioning under a good faith belief that there was such an organization throughout all relevant times in this case.

In MREC's ruling, the basis of its earlier decision relating to the HOA and declaration of restrictions became much broader and less precise, relying, for example, on the existence of an "association" rather than an HOA:

> Based upon a preponderance of the evidence and testimony presented, [MREC] concludes that: 1) [Ms. Garceau] was aware that the [Buyers] did not wish to purchase a property which was subject to **a homeowner's association or community association or to any covenants or restrictions such as those set forth in a 1975 Declaration of Restrictions or a 2006 Declaration of Restrictions by the CCECA** filed in the Land Records of Harford County; 2) [Ms. Garceau] was aware of a Declaration of Restrictions which purported to apply protective covenants and restrictions on the properties situated in the Cross Country Estates development; 3) **The CCECA was an active association which functioned as a homeowner's association and enforced protective covenants and restrictions on the properties, including the subject property**, which were situated in Cross Country Estates at all times relevant to this matter and until contacted by counsel for [Ms. Garceau] subsequent to hearing of this matter before an ALJ; . . .

---

[13] The circuit court may order that the agency take additional evidence on terms that the court deems proper if the court is satisfied that the evidence is material and there were good reasons for failure to offer the evidence before the agency. *See* Maryland Code (1984, 2014 Repl. Vol.), State Government Article ("SG"), § 10-222 (f)(2).

(Emphasis added). MREC's finding that the CCECA was an association that intended to function as an HOA apparently led to MREC's conclusion that Ms. Garceau failed to disclose the existence of a material fact:

> . . . 4) **[Ms. Garceau] intentionally or negligently failed to disclose to the [Buyer]s the existence of a material fact, i.e. the existence of an association which was enforcing protective covenants and restrictions set forth in a Declaration of Restrictions which the officers of the association believed were applicable to the Property the [Buyer]s were interested in purchasing**; and 5) the [Buyer]s modified their plans for a fence based on the assertions of the CCECA that covenants/restrictions, set forth in a Declaration of Restrictions, applied to fences built in Cross Country Estates.

(Emphasis added).

MREC's ruling in regard to the possibility of well contamination remained, however, relatively similar to its prior determination. MREC found that regardless of whether or not the Sellers disclosed the class action or periodic testing of their well, Ms. Garceau "admitted that she was aware of the possible contamination of wells in the area because of a gasoline station leak." Additionally, "due to her own participation in the class action lawsuit, the fact that she lived within a mile of the subject Property, and media coverage of the possible contamination of wells in the area," Ms. Garceau knew or should have known of the class action and possible contamination. Thus, MREC concluded, Ms. Garceau "should have disclosed these material facts to the [Buyers], but failed to do so."

Within 30 days of the order's mailing,[14] Ms. Garceau filed a petition for judicial review in the Circuit Court for Harford County. On September 14, 2015, the circuit court

---

[14] *See* Maryland Rule 7-203(a) (providing, *inter alia*, that a petition for judicial review be filed within 30 days of the order's mailing).

22

found that there may have been substantial evidence in the record to find that Ms. Garceau had violated the Maryland Real Estate Broker's Act, but it found the imposition of the sanction to be arbitrary and capricious. The court stated that it believed that MREC "inadequately addresse[d] or consider[ed] the specific facts for which this case was remanded." The court also determined that MREC failed to consider the factors for monetary penalties that BOP § 17-322 prescribes. As such, the court ordered the 14-day suspension to be set aside, but left the $4,000.00 fine in place.

On October 5, 2015, MREC timely noted an appeal, and Ms. Garceau followed suit by filing a cross-appeal on October 13, 2015. They present the following general questions, which we have consolidated and rephrased:

1. Is MREC's decision that Ms. Garceau violated the Maryland Real Estate Broker's Act and COMAR 09.11.02.01A legally correct, supported by substantial evidence, and compliant with the requirements of due process?

2. Was MREC's choice of sanction—a $4,000.00 civil monetary penalty and a fourteen-day license suspension—arbitrary or capricious? [15]

---

[15] MREC's question, as stated in its brief on appeal, is:

I.    "Did the Commission act within its statutorily authorized discretion by imposing on Garceau as a sanction for her violations of the Maryland Real Estate Broker's Act a fourteen-day license suspension and a $4000 civil monetary penalty?"

Ms. Garceau's questions, as stated in her brief, are:

I.    "Should the Decision of the Real Estate Commission Finding that Garceau Violated MD. Code Ann., Bus. Occ. & Prof. §§ 17-322(b)(4), (25), and (33) and COMAR 09.11.02.02 A and B be Reversed Because the 2014 Order Exceeds the Commission's Statutory Authority, is Affected by Errors of Law, is Unsupported by Competent, Material, and

**DISCUSSION**

Judicial review of the action of an administrative agency is limited to determining whether "there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law." *Regan v. Bd. of Chiropractic Exam'rs*, 120 Md. App. 494, 508 (1998). If the facts in the record allow reasoning minds to reach the same determination as the agency, "'then [the determination] is based upon substantial evidence, and the court has no power to reject that conclusion.'" *Maryland State Bd. of Nursing v. Sesay*, 224 Md. App. 432, 457 (2015) (quoting *Liberty Nursing Ctr., Inc. v. Dep't of Health & Mental Hygiene*, 330 Md. 433, 443 (1993)). However, in order that a court may "perform properly its examination function, an administrative decision *must* contain factual findings on *all the material issues* of a case and a clear, explicit statement of the agency's rationale." *Fowler v. Motor Vehicle Admin.*, 394 Md. 331, 342 (2006) (citation omitted; emphasis added). As the Court of Appeals cautioned in *Bereano v. State Ethics Commission*, "where an administrative . . . agency draws impermissible or unreasonable

---

Substantial Evidence in Light of the Entire Record as Submitted, is Arbitrary and Capricious, and Deprives Appellant of Due Process?"

II.     "Did the Real Estate Commission Exceed its Statutory Authority and Act Arbitrarily and Capriciously When It Imposed a 14 Day License Suspension and a $4,000 Fine?"

Although Ms. Garceau's question references COMAR 09.11.02.02A and B, MREC's final order concluded that Ms. Garceau violated only COMAR 09.11.02.01A. As explained *supra*, n. 9, the record is replete with such inaccuracies, and Ms. Garceau does not appear to have objected to the mislabeling at any point.

24

inferences and conclusions . . . or where an administrative agency's decision is based on an error of law, we owe the agency's decision no deference." 403 Md. 716, 756 (citation omitted; ellipses in original).

When an agency is acting in a discretionary capacity, such as when it fashions a sanction, then the standard is more deferential than either substantial evidence or *de novo* review. An agency's discretion in fashioning a sanction should only be overturned if the decision is arbitrary or capricious. *Maryland Aviation Admin. v. Noland*, 386 Md. 556, 581 (2005). The arbitrary or capricious standard is "highly deferential." *Maryland Dep't of Env't v. Anacostia Riverkeeper*, 447 Md. 88, 121 (2016) (citation omitted).

## I.

### Due Process

At the outset we address Ms. Garceau's argument that the proceedings in this case did not afford her due process. Ms. Garceau states that MREC did not provide her due process because it originally charged her with failing to disclose the existence of an HOA and a declaration of restrictions. She contends that, to comport with due process, MREC would have to amend its statement of charges to reflect that the CCECA was a community association holding itself out as an HOA. She maintains that she was not afforded due process when, after remand, MREC conducted another meeting and found that she violated BOP § 17-322 based on different allegations than those upon which she was originally charged.

MREC replies that due process in the administrative context does not require any particular procedure, but, rather, is flexible and requires only that a party have notice and

25

the opportunity to be heard. MREC then catalogues, in great detail, all of the process and opportunities to present evidence in her defense that Ms. Garceau was provided. MREC also argues that Ms. Garceau's due process argument was not preserved because it was not raised before MREC.

Due process requires that a person "be given notice and an opportunity to be heard." *Maryland Racing Comm'n v. Belotti*, 130 Md. App. 23, 55 (1999) (citing *LaChance v. Erickson*, 522 U.S. 262, 266 (1998)). However, "due process is flexible and calls only for such procedural protections as the particular situation demands." *Dep't of Transp., Motor Vehicle Admin. v. Armacost*, 299 Md. 392, 416 (1984) (citations omitted). "In the administrative setting, due process may require only a hearing at some stage of the process." *Belotti*, 130 Md. App. at 55 (citing *Quesenberry v. Wash. Suburban Sanitary Comm'n*, 311 Md. 417, 425 (1988)). But, "[a]n agency has discretion, as long as it does not *change the nature of the original proceeding*, violate due process, act arbitrarily, or run afoul of some legislative or self-imposed requirement. *Bd. of Cty Comm'rs for St. Mary's Cty. v. S. Res. Mgmt.,* 154 Md. App. 10, 29 (2003) (emphasis added).

We begin with MREC's preservation argument. Ordinarily, a reviewing court is "restricted to the record made before the administrative agency, . . . [and] may not pass upon issues presented to it for the first time on judicial review and that are not encompassed in the final decision of the administrative agency." *Dep't of Health & Mental Hygiene v. Campbell*, 364 Md. 108, 123 (2001). The record on appeal, however, demonstrates that Ms. Garceau raised the issue of MREC's failure to provide due process in a November 6, 2014, memorandum she filed with the circuit court during its second review of the second

26

MREC order. The following instruction appears on the final page of MREC's order dated May 29, 2014:

> Note: A judicial review of this Final Order may be sought in the Circuit Court of Maryland in which the Appellant resides or has his/her principal place of business, or in the Circuit Court for Baltimore City. A petition for judicial review must be filed with the court within 30 days after the mailing of this Order.

Clearly there was no opportunity for Ms. Garceau to file exceptions with the agency regarding her due process argument, which only became apparent when MREC issued its second final order—proving not only that her due process argument is preserved, but also that it has merit. We hold that Ms. Garceau did not waive a legal argument that was not raised before MREC when MREC did not provide her an opportunity to be heard.

In determining whether a party was denied due process of law, we must "balance the interest of the state . . . against the individual interest sought to be protected by the [F]ourteenth [A]mendment." *Golden Sands Club Condominium, Inc. v. Waller*, 313 Md. 484, 496 (1988). It is true, as MREC points out, that the Charging Document alleged that Ms. Garceau "should have been aware, that the Cross Country Court property was part of a homeowners, **or community, association** and that the property was governed by a Declaration of Restrictions[.]" (Emphasis added). Notice, however, even in the administrative context, must be "reasonably calculated" to inform the party of the "pendency of the action" against it. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). Here, the basis of MREC's findings and sanctions starkly morphed from non-disclosure of mandatory HOA dues and binding restrictions in its first order, to

27

non-disclosure of a non-binding community association with non-enforceable covenants in its second order.

As we explain next, MREC's conclusion that Ms. Garceau violated BOP § 17-322(b) by not revealing the existence of an association that purported to be a valid HOA is both logically and legally erroneous. Rather than modify its sanction in light of the evidence in accordance with the circuit court's instructions, MREC decided, implacably, to alter its theory and basis for the alleged violation in order to retain the sanctions it originally imposed. Such action contravenes the core requirement of due process that a party receive reasonable notice of the allegations against it so that it can prepare—and present—a defense. *See Regan v. Bd. of Chiropractic Exam'rs*, 120 Md. App. 494, 510, 519 (1998)). MREC took this action without a hearing and without giving Ms. Garceau and opportunity to file exceptions. We hold, therefore, that MREC failed to afford Ms. Garceau due process in regard to its findings and conclusions of law contained in its order of May 29, 2014, involving Ms. Garceau's failure to disclose to Buyers the existence of the CCECA and a declaration of restrictions.

## II.

### What Makes a Fact Material?

### A. The CCECA

We now turn to the issue of whether Ms. Garceau's failure to disclose the existence of the CCECA constitutes a violation of BOP § 17-322. Broadly, Ms. Garceau argues that

28

MREC's conclusion that she violated BOP § 17-322 was incorrect as a matter of law[16] and not supported by substantial evidence. MREC, of course, disagrees. We conclude that substantial evidence does not support MREC's decision regarding the CCECA.

The relevant statute, BOP § 17-322 provides, in pertinent part:

**Grounds for discipline**
(b) Subject to the hearing provisions of § 17-324 of this subtitle, the Commission may deny a license to any applicant, reprimand any licensee, or suspend or revoke a license if the applicant or licensee:

* * *

(4) intentionally or negligently fails to disclose to any person with whom the applicant or licensee deals a material fact that the licensee knows or should know and that relates to the property with which the licensee or applicant deals;

* * *

(25) engages in conduct that demonstrates bad faith, incompetency, or untrustworthiness or that constitutes dishonest, fraudulent, or improper dealings;

* * *

(33) violates any regulation adopted under this title or any provision of the code of ethics . . .

* * *

**Determination of penalty**
(c)    (1) Instead of or in addition to reprimanding a licensee or suspending or revoking a license under this section, the Commission may impose a penalty not exceeding $5,000 for each violation.
(2) To determine the amount of the penalty imposed, the Commission shall consider:
        (i) the seriousness of the violation;

---

[16] Because we ultimately decide this case on narrower grounds than the parties urge, we attempt to simplify this case by summarizing only the parties' general arguments.

(ii) the harm caused by the violation;
(iii) the good faith of the licensee; and
(iv) any history of previous violations by the licensee.

Several cases guide our analysis as to whether there is substantial evidence in the record to support MREC's determination that Ms. Garceau violated BOP § 17-322 by not disclosing the existence of the CCECA. In *Lopata v. Miller*, a tort case, the appellants (buyers of real property) sued appellees (real estate agents who facilitated the transaction), for, *inter alia*, negligent misrepresentation, strict liability, and negligence, after the appellees relayed to the appellants information that the property was approximately 1.3 acres larger than its actual size. 122 Md. App. 76, 79-83 (1998). Thus, appellants moved into the home and lived there for more than three years before they first discovered that the property contained only 1.87 acres, instead of three acres as they previously believed. *Id.* In that case, the appellants had made no specific inquiries to the appellees concerning the size of the property. *Id.* at 82-83. The circuit court granted a motion to dismiss on the negligence and strict liability counts and summary judgment as to all other counts. *Id.* at 80.

On appeal, the appellants argued that BOP § 17-322(b) imposed strict liability on any broker who committed any of the proscribed violations. 122 Md. App. at 92-93. This Court declined to interpret the statute that way. *Id.* at 94. After holding that the brokers in that case did not have a duty to investigate the lot size of the subject property (in part because the appellants made no specific inquiries concerning lot size), *see id.* at 91-92, this Court "read the provisions [from BOP § 17-322] as having the more limited effect of prohibiting real estate agents from making affirmative misrepresentations and omissions

30

of fact that the agent knows or has a duty to discover." *Id.* at 94. This Court held that the communication of the acreage discrepancy was not "a misrepresentation or omission of fact that appellees knew or had a duty to discover under the circumstances." *Id.* at 94.

In *Lewis v. Long & Foster Real Estate, Inc.*, the appellants (prospective purchasers of real property) informed appellee (a real estate broker) before settlement of their need to be able to operate a day care business from their home. 85 Md. App. 754, 757-58 (1991). Although the broker made inquiries, the broker did not discover the existence of an HOA and declaration of restrictions and, therefore, did not inform the appellants of such. *Id.* at 757-58. After settlement and after the appellants began operating their day care business, the HOA attempted to restrict the operation of the day care. *Id.* Appellants sued the broker for negligence, negligent misrepresentation, and breach of contract. *Id.* at 756. The circuit court dismissed the appellants' claims for failure to state a claim on which relief could be granted. *Id.* at 758.

On appeal before this Court, the appellants argued that former BOP § 17-322(b) imposed a tort duty on the broker. *Id.* at 759. This Court explained:

> The Maryland legislature has seen fit to regulate the field of real estate sales through these statutes and regulations. As a regulated profession, much like physicians, attorneys, or certified public accountants, real estate brokers have a responsibility to the public to conduct themselves in a reputable manner. These statutes set minimum guidelines for professional conduct, their purpose being to safeguard the public.

*Id.* at 760. This Court further stated that "[i]t is well-settled in Maryland law that a real estate broker's liability is founded on the law of agency." *Id.* at 761. The Court explained:

> A real estate broker has no duty to investigate and report on defects which might exist in property. That duty changes, however, when the parties are

31

not conducting an arm's length transaction. When a relationship of trust and confidence exists or when specific questions are asked concerning some aspect of a transaction, a duty of disclosure can arise.

*Id.* at 763 (internal citations omitted). Thus, although a broker has no general duty to investigate whether an HOA exists, that duty may arise if specific questions concerning an HOA are asked of the broker. *Id.*

And, in *Gross v. Sussex, Inc.*, the Court of Appeals stated that former BOP § 17-322's purpose was "to protect the public in its dealings with real estate brokers [and] to place a duty of good faith and fair dealing on real estate brokers." 332 Md. 247, 274 (1993). In that case, the broker (and home builders) had made representations that subdivision approvals and construction permits had been obtained (when in fact they had not been) and that construction would be completed based on a certain date. *Id.* at 251-52. The buyers enrolled their children in a school near the house based on that representation. *Id.* at 251-52. The new house was not completed until more than a year later. *Id.* at 252. The buyers in that case sued the brokers, arguing that the statute gave rise to an independent tort duty for the broker to disclose material facts to those with whom the broker deals. *Id.* at 275. The Court determined that summary judgment on this issue was granted improperly and remanded the case to the circuit court. *Id.* at 275-76.

The Court of Appeals defined "materiality" as:

> "In a business transaction, reliance upon a misrepresentation of a fact, intentionally misrepresented or otherwise, is justifiable only if the fact misrepresented is material. **A fact is material if its existence or non-existence is a matter to which a reasonable man would attach importance in determining his choice of action in the transaction**, or the maker of the misrepresentation knows that its recipient is likely to regard the fact as important although a reasonable man would not so regard it."

32

*Id.* at 258 (emphasis added; citation omitted).  Similarly, in *Ward Development Co., Inc. v. Ingrao,* this Court stated that for a "plaintiff justifiably to take action in reliance on a statement, that statement must be a representation of a material *fact.*"  63 Md.App. 645, 493 (1985) (emphasis added).

In light of the foregoing cases, we conclude that there was not substantial evidence in the record to support MREC's decision that nondisclosure of the CCECA constituted a violation of BOP § 17-322(b)(4) and (25).  Although BOP § 17-322 does set minimum standards for real estate agents so as to protect the public, *see id.* at 274; *Lewis*, 85 Md. App. at 760, the non-disclosed fact must be "material."  In all of the cases just discussed, the misrepresentations at issue concerned facts actually existing in the real world, such as the procurement of a building permit, *Gross*, 332 Md. at 251-52, the size of a plot of land, *Lopata*, 122 Md. App. at 79-83, or the *actual* existence of an HOA and restrictive covenants, *Lewis*, 85 Md. App. at 757-58.  In distinction to those cases, the undisputed evidence here establishes that the "material fact" (of the HOA) is non-existent.  The officers of the putative HOA (the CCECA) admitted in writing that there was no HOA.  And, the officers stated specifically that "the covenants and restrictions which were put into effect at the time that [the] neighborhood was established have expired and there are no current valid or enforceable restrictions in effect beyond those that would be imposed by county regulations."  We reject MREC's attempt to cast the existence of a non-binding community association, and non-existent covenants and restrictions, as "material facts" when the Charging Document stated that "it is alleged that the buyers were interested only in

33

properties which did not involve homeowners associations, as they wanted to avoid properties with certain restrictions.  It is alleged that [Ms. Garceau] was aware of that fact."

It is not mind-bending to conclude that a non-existent fact cannot be a "material" fact.  MREC erred when it found Ms. Garceau violated BOP § 17-322(b) by not revealing the existence of an HOA and binding declaration of restrictions that, in fact, did not exist.  Indeed, had Ms. Garceau told prospective buyers that a valid HOA existed and a valid declaration of restrictions bound the neighborhood—that "disclosure" might have been a negligent misrepresentation because it would have been false.[17]  In these circumstances, we conclude that there was not substantial evidence to support MREC's decision that Ms. Garceau's failure to inform the Buyers of the existence of the CCECA was a violation of BOP § 17-322(b).  For the same reason that the non-existent HOA and non-existent binding restrictions were not "material" facts, we also conclude that Ms. Garceau's lack of disclosure was not "conduct that demonstrates bad faith, incompetency, or untrustworthiness or that constitutes dishonest, fraudulent, or improper dealings[.]"  We conclude that Ms. Garceau did not violate either BOP § 17-322(b)(4) or (25) in not disclosing the CCECA.

## B. The ExxonMobil Gas Leak and Potential Well Contamination

Next, Ms. Garceau contends that MREC's conclusion that she violated BOP § 17-322(b)(4), (25), and (33) and COMAR 09.11.02.01(A), concerning a failure to disclose the

---

[17] We do not need to speculate, fortunately, what would have happened had Ms. Garceau incorrectly informed the Buyers that an HOA existed and the Sellers had filed a complaint against her because the transaction fell through.

ExxonMobil gas leak and the potential well-water pollution, is not supported by substantial evidence and is incorrect as a matter of law. She argues, relying on *Gross*, discussed *supra*, that a broker has no independent duty to investigate in the absence of actual knowledge. She further maintains that she made reasonable inquiries and disclosed everything she knew. Ms. Garceau then makes further factual arguments stating that she did not have knowledge of the class action lawsuit before the Buyers' complaint.

MREC argues that there is substantial evidence in the record to support its decision, and that its decision is correct as a matter of law. On these points, we agree with MREC. There was substantial record support for MREC's finding that Ms. Garceau knew of the potential well contamination before her dealings with the Buyers. She told MREC's investigator that "'of course'" she was aware of potential contamination because she lives less than a mile from the Property and that the ExxonMobil case was common knowledge within the neighborhood. She said the same in her affidavit to MREC, although she specifically pointed out that all tests from the Property had been negative. Nonetheless, Ms. Garceau did not ask the Sellers about potential well testing until May 2010, a year after settlement.[18] Moreover, the potential well contamination was the subject of several earlier news stories, as reflected in the record.

---

[18] MREC further argues that Ms. Garceau was a member of a class action lawsuit against ExxonMobil regarding the potential pollution; however, according to the record, she was never actively involved in the class action suit. Moreover, the record does not demonstrate that she had any scienter of the class action suit in 2009. Ms. Garceau states in her affidavit that she was not aware of the class action suit until she received two letters (contained in the record before the MREC and on appeal) dated October 5, and November 2, 2011. The October 5 letter notified Ms. Garceau and her husband that they were included in a class action suit that was filed in 2004, but that the class action had been decertified.

Ms. Garceau's failure to inform Buyers of the potential well contamination was a material omission. The Court of Appeals in *Golt v. Phillips* set out a relatively objective standard for determining whether the omission of a fact is material. 308 Md. 1 (1986). There, a disabled senior citizen inspected an apartment, signed a lease, and moved in, at which time he discovered that the toilet facilities were outside of his unit and would be shared. *Id.* at 5. Additionally, after repair requests went ignored, he called a city housing inspector, who found code violations and uncovered that the property was unlicensed for multiple tenants. *Id.* at 5-6. After being evicted and having most of his security deposit withheld, the senior citizen filed suit, including a claim for violation of the Consumer Protection Act ("CPA"), which prohibits unfair and deceptive practices in consumer rental property. *Id.* at 6, 8 (citing Maryland Code (1983 Repl. Vol.), Commercial Law Article "CL", § 13-303). The trial court precluded any recovery under the CPA, however, because the senior citizen inspected the premises prior to signing the lease and therefore "knew what the premises looked like." *Id.* at 6.

On appeal, the Court of Appeals found that the management company violated CL § 13-301(3), and that failure to disclose a material fact—which deceives or tends to deceive—is unfair or deceptive. *Id.* at 10. The Court reasoned that "[a]n omission is considered material if a significant number of unsophisticated consumers would attach

The November letter, from the Garceau's insurance broker, related a conversation he had with the class action law firm, stating "they assure me that they were acting responsibly by adding us to this class action suit without our knowledge."

36

importance to the information in determining a choice of action[,]" *id.* at 10, and referenced

the definition of "materiality" set out in the Second Restatement of Torts, which states:

> The matter is material if (a) a reasonable [person] would attach importance to its existence or non-existence in determining his [or her] choice of action in the transaction in question; or (b) the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his [or her] choice of action, although a reasonable man would not so regard it.

Restatement (Second) of Torts § 538 (1977). The Court concluded that simply viewing an

apartment before leasing would not provide knowledge that the dwelling was unlicensed,

and that a lack of proper licensing would be a material fact for any tenant in determining

whether to sign a lease and live in the dwelling. *Golt.* 308 Md. at 10-11.

Returning to the case at bar, Mr. Willig testified that he and his wife would not have

purchased the Property had they known about the ExxonMobil gas leak and the potential

well contamination issues. MREC could infer from the testimony and evidence in this case

that "a significant number of unsophisticated consumers would attach importance to the

information" before purchasing a home. *Id.* at 10. The potential existence of well

contamination was, therefore, a material fact in this transaction.

We conclude there was substantial evidence in the record to support MREC's

finding that 1) the failure to disclose the material fact—-"that due to actual and potential

contamination of wells in the area, including in Cross Country Estates, the Property was

subject to periodic well testing for possible contamination"—cconstituted a violation of

BOP § 17-322(b)(4); and 2) the failure to disclose "demonstrate[d] bad faith,

incompetency, or untrustworthiness or that constitutes dishonest, fraudulent, or improper

dealings[,]" constituting a violation of BOP § 17-322(b)(25).  Given the media attention focused on ExxonMobil case and this well-water contamination story, we also conclude that there is substantial evidence to support the finding that Ms. Garceau failed to "remain informed of matters affecting real estate in the community, the State, and the nation[,]" which constituted a violation of COMAR 09.11.02.01, as well as a violation of BOP § 17-322(b)(33).  Therefore, we hold that MREC's decision with regard to the well testing was supported by substantial evidence and was correct as a matter of law.[19]

### III.

### MREC's Choice of a Sanction/MREC's Appeal

We now arrive at MREC's question on appeal and analyze whether the sanction that MREC imposed was arbitrary or capricious.  MREC argues that, after determining that Garceau violated three provisions of BOP § 17-322(b), it had clear discretion to determine whether to reprimand or suspend Ms. Garceau or to revoke her license and that the statute does not require any specific factors for the agency to consider in deciding which of these sanctions to impose.[20]  MREC maintains that it imposed a "relatively minor sanction," given that the agency could have imposed any penalty, including revocation of her license and that the suspension "was also far from extreme and egregious given the seriousness

---

[19] The conduct complained of clearly falls within the plain language of the violations of the applicable statute and corresponding COMAR provision.

[20] This is in contrast to a monetary penalty, as to which BOP § 17-322(c) prescribes four factors that the agency must consider.  MREC argues that it did consider the requisite factors before imposing the monetary penalty.

38

of" the violations. MREC states that the selected sanction was reasonable and had a rational basis.

MREC further maintains that the circuit court was incorrect because it did not need to reduce its sanction in light of the potentially exculpatory evidence the court ordered it to consider. The agency contends that Ms. Garceau's actions must be viewed at the time they occurred, not in light of the later realization that CCECA was an invalid HOA.

In riposte, Ms. Garceau urges that MREC's sanction was arbitrary and capricious because (1) Ms. Garceau's statements were correct; (2) the Buyers were not monetarily harmed; (3) the Buyers accepted responsibility for environmental matters in the contract of sale; and (4) the Buyers did not attempt to enforce their own rights. She contends that the agency must provide an adequate explanation for the sanction it chose and did not do so in her case. Lastly, Ms. Garceau argues that the sanction is grossly disproportionate to any possible violation because, for two weeks, it will grind to a halt a business employing 45 people.

MREC asserts that an agency need not articulate the reasons for the sanction it imposes, and that a reviewing court does not have the authority to impose its own sanction in light of what it deems appropriate. MREC maintains that it did adequately consider the requisite factors in § 17-322(c) before imposing the civil monetary penalty. And, MREC argues that (1) the Buyers need not suffer monetary harm before MREC may discipline Ms. Garceau, and (2) any exculpatory clauses in the contract of sale do not insulate Ms. Garceau from MREC's discipline.

As stated in the outset of this discussion, an agency's discretion in fashioning a sanction should only be overturned if the sanction is arbitrary or capricious. *See Noland*, *supra*, 386 Md. at 581; *Spencer*, *supra*, 380 at 531; *King*, *supra*, 369 Md. at 291. In *Noland*, the agency terminated an employee and disqualified him from further service, in spite of eleven prior years of exemplary service, because he struck a patient. 386 Md. at 566-67. The circuit court reversed, basing its decision upon the belief that the agency gave insufficient consideration to substantial mitigating factors, and the Court of Special Appeals affirmed. *Id.* at 567-69. After engaging in a thorough review of how judicial review of an agency sanction is exceptionally deferential under the arbitrary or capricious standard, *see id.* at 571-77, the Court of Appeals reversed. *Id.* at 582. The Court explained that an agency "need not justify its exercise of discretion" when its discretionary sanction is lawful, and that a reviewing court may only overturn the sanction if its "'disproportionality or abuse of discretion was so extreme and egregious that the reviewing court can properly deem the decision to be 'arbitrary or capricious.'" *Id.* at 581 (quoting *King*, *supra*, 369 Md. at 291). Further, the Court continued,

> the employing agency does not have the burden, in the reviewing court, of justifying such a sanction. Instead, in accordance with the principle that the agency's decision is prima facie correct and presumed valid, the burden in a judicial review action is upon the party challenging the sanction to persuade the reviewing court that the agency abused its discretion and that the decision was "so extreme and egregious" that it constituted "arbitrary or capricious" agency action.

*Id.* (internal citation omitted).

The circuit court in the instant case, acknowledging the extremely deferential standard of review agencies are afforded under *Noland* and *King* in fashioning sanctions,

40

remanded the case initially to give MREC the opportunity to revise the sanction that it imposed in light of the unrefuted evidence that Ms. Garceau did not intentionally or negligently fail to disclose the existence of a non-existent HOA. Yet, as the circuit court aptly explained, MREC refused to modify the sanctions, giving "no apparent consideration" to additional evidence

> indicating the non-existence of a compulsory homeowners' association or any specific restrictions on the property. In the opinion of the Court, those facts severely undermine the validity of almost any claim for sanctioned conduct on the part of the agency's complaint.
> Normally, it is within an agency's authority to exercise its discretion within the limits permitted by appropriate statutes and regulations. Evidence of an appropriate exercise of discretion should be apparent from the subject action that can be found in a decision and the record made of a proceeding. A proper exercise of discretion should demonstrate that the agency gave full and unbiased consideration to all of the factors in any case. Discretion exercised to impose sanctions in ways that are manifestly unreasonable, however, or if sanctions are imposed for unenforceable or impermissible grounds are an abuse of that authority. It would appear in the present case, that the agency failed to appropriately exercise the full scope of its authority to reconsider the sanction in the case or, in the alternative, completely failed to properly exercise its discretion in favor of an unyielding adherence to a pre-determined sanction.

Because, upon remand, MREC failed to consider the exculpatory evidence and modify the sanction it originally imposed, the circuit court, frustrated, fashioned its own modification of the sanction by vacating the suspension and leaving the $4,000.00 fine in place.

We agree with the circuit court that, under the circumstances, this case presents an instance when the "disproportionality [of the sanction] or abuse of discretion was so extreme and egregious that the reviewing court can properly deem the decision to be 'arbitrary or capricious.'" *King, supra,* 369 Md. at 291. The exculpatory evidence presented in this case demonstrated that Ms. Garceau's lack of disclosure of the CCECA

41

did not constitute a violation of BOP § 17-322. By contending that Ms. Garceau's actions must be viewed in light of what was believed by some people to be the case—before her attorneys demonstrated that there was no binding HOA—MREC asks this Court to turn a blind eye to whether it imposed a sanction for her failure to disclose *false* information about the Property.

We hold that MREC's combined sanction (the fine and the suspension), originally imposed for both violations, is arbitrary and capricious following MREC's failure to consider modifying it upon remand in light of the exculpatory evidence. We affirm MREC's decision as to Ms. Garceau's failure to disclose the potential contamination of the well water, and recognize that MREC could have imposed a greater penalty for that violation originally. However, the exculpatory evidence that MREC was directed to consider on remand by the circuit court was not evidence that would warrant a greater sanction, but rather, a downward revision of the sanction MREC originally imposed. MREC cannot sanction Ms. Garceau for failing to disclose the existence of a non-existent homeowners association, and the overall combined sanction imposed by MREC on Ms. Garceau should be modified accordingly.[21]

---

[21] In spite of the burden on Appellee and on judicial economy caused by MREC's obduracy in this case, the circuit court should have remanded the case to MREC a second time with instructions to modify the sanction. Especially in this case, in which BOP § 17-322 offers a range of permissible sanctions for the two separate violations brought against Ms. Garceau, our decisional law directs that it is within the province of the agency to determine how the sanction should be modified to address the remaining violation against Ms. Garceau for failing to disclose potential well-water contamination. *See King*, *supra*, 369 Md. at 291, n.2.

**JUDGMENT OF THE CIRCUIT COURT AFFIRMED AS TO THE RULINGS ON THE CHARGES AND REVERSED AS TO ITS MODIFICATION OF SANCTIONS; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REMAND TO THE AGENCY WITH INSTRUCTIONS TO THE AGENCY TO RECONSIDER SANCTIONS IN LIGHT OF THE CIRCUIT COURT'S RULING AND OUR HOLDING.**

**COSTS TO BE PAID 80% BY APPELLANT/CROSS-APPELLEE, MARYLAND REAL ESTATE COMMISSION AND 20% BY APPELLEE.**